THOMAS GANGEMI AND MICHAEL R. PERRELLA, PLAIN-
TIFFS-APPELLANTS, v. BERNARD ROSENGARD, INDI-
VIDUALLY AND AS CITY CLERK OF THE CITY OF JER-
SEY CITY, DEFENDANT-RESPONDENT.

Argued February 1, 1965—Decided February 26, 1965.

*Mr. Telford Taylor*, of the District of Columbia and New York Bars argued the cause for appellants (*Mr. Jack Geddy Goldberg*, attorney).

*Mr. T. James Tumulty*, Assistant Corporation Counsel, argued the cause for respondent (*Mr. Francis X. Hayes*, on the brief; *Mr. Meyer Pesin*, Corporation Counsel of City of Jersey City, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. This case involves the validity of *Chapter* 84, *L.* 1960 (*N. J. S. A.* 40:69A–167.1), which supplements the Optional Municipal Charter Law, popularly called the Faulkner Act, and provides:

"In any city of the first class, elected officers, including members of a charter commission, shall, for at least 2 years before election, be registered voters and residents of the municipality; and ward officers shall also be residents of the respective wards for which elected for a period of 8 months before election."

Plaintiff Gangemi seeks to run in May 1965 for the office of Mayor in Jersey City, a city of the first class which heretofore adopted one of the plans under the Faulkner Act, *N. J. S. A.* 40:69A–1 *el seq.* He has resided in Jersey City for some 50 years and hence is not troubled by so much of *Chapter* 84 as requires elected officers to be "residents" of the municipality for at least two years. His problem stems from the further demand that elected officers shall be "registered voters" for at least two years. Gangemi became a naturalized citizen on September 2, 1964 and registered for voting on the following day. Although registered, he cannot meet the requirement

that registration shall have endured for the two-year period.[1] This case turns on the constitutionality of that requirement.

Plaintiffs contend *Chapter* 84 violates *Art.* IV, § VII, ¶ 9 of our State Constitution which prohibits local or special laws regulating the internal affairs of municipalities and requires the passage of general laws in such matters. The law is claimed to be local and special and not general because it applies (1) only to a city, and then (2) only to a city of the first class, and even then (3) only if such a city has adopted a plan of government under the Faulkner Act. Plaintiffs deny any rational connection between the object of *Chapter* 84 and any one or the totality of the three attributes of municipal life just enumerated. In like terms, the statute is assailed as violative of the equal protection clause of the Fourteenth Amendment and of the equality provision inherent in *Art.* I, ¶ 1 of the State Constitution.

On motion, the trial court sustained the statute and gave judgment for defendant. The appeal was certified on motion before argument in the Appellate Division. *R. R.* 1:10–1A.

We asked the parties to argue the additional question whether a statute requiring a period of voter registration is beyond the legislative power. We had in mind whether that provision improperly restrains the right to vote assured by our State Constitution. Our request elicited still another issue we did not have in mind, *i. e.*, whether *Chapter* 84 discriminates against naturalized citizens in violation of the Fourteenth Amendment and the provision of our State Constitution which bars discrimination as to civil rights on account of ancestry or national origin. *Art.* I, ¶ 5. Plaintiffs refer to *Schneider v. Rusk*, 377 *U. S.* 163, 84 *S. Ct.* 1187, 12 *L. Ed.* 2d 218 (1964), and the point made is that in its actual

---

[1] Gangemi had been a registered voter for many years, and indeed had been elected Mayor of Jersey City. A question having arisen with respect to the nation of his birth, he resigned from that office on September 27, 1963. He does not rely upon his earlier registration, doubtless because to do so would raise still another issue as to the validity of that registration and its sufficiency under *Chapter* 84.

operation *Chapter* 84 would delay eligibility for office on the part of one naturalized after attaining voting age, thus disadvantaging him vis-a-vis a citizen by birth. We need not reach this issue since other grounds suffice to sustain plaintiffs' attack.

## I.

The right to vote did not share in the glorious history of other democratic values. At the time of the American Revolution it was not among the inalienable blessings of man. So, our *Constitution of* 1776 limited the right to vote for representatives in the council and assembly to inhabitants "worth fifty pounds" (*Art.* IV), and required that a member of the legislative council be a "freeholder * * * and worth at least one thousand pounds, proclamation money, of real and personal estate" within his county, and that a member of the assembly be worth half that much (*Art.* III).

Universal suffrage was a long way off. Our *Constitution of* 1844 assured a vote only to every "white male" (*Art.* II, ¶ 1). By an amendment in 1875 "white" was eliminated, in response of course to the Civil War and the Fifteenth Amendment to the Federal Constitution. Women had to wait for the Nineteenth Amendment. Finally our State *Constitution of* 1947 (*Art.* II, ¶ 3, since amended in respects not here critical) provided:

"Every citizen of the United States, of the age of twenty-one years, who shall have been a resident of this State one year, and of the county in which he claims his vote five months, next before the election, shall be entitled to vote for all officers that now are or hereafter may be elective by the people, and upon all questions which may be submitted to a vote of the people."

And in the reapportionment decisions of the United States Supreme Court, the equal protection clause of the Fourteenth Amendment was found to undergird the right to vote, at least to the extent of assuring an equal voice to all who hold the right. See *Reynolds v. Sims,* 377 *U. S.* 533, 84 *S. Ct.* 1362,

12 *L. Ed. 2d* 506 (1964) ; *Jackman v. Bodine,* 43 *N. J.* 453 (1964).

Thus, despite an impoverished beginning, the right to vote has taken its place among our great values. Indeed the fact that the voting franchise was hoarded so many years testifies to its exalted position in the real scheme of things. It is the citizen's sword and shield. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 *U. S.* 1, 17, 84 *S. Ct.* 526, 585, 11 *L. Ed. 2d* 481, 492 (1964). It is the keystone of a truly democratic society.

And the right to vote would be empty indeed if it did not include the right of choice for whom to vote. See *Ransom v. Black,* 54 *N. J. L.* 446, 460 (*Sup. Ct.* 1892), affirmed 65 *N. J. L.* 688 (*E. & A.* 1893) ; *Imbrie v. Marsh,* 5 *N. J. Super.* 239, 245–246 (*App. Div.* 1949), affirmed 3 *N. J.* 578 (1950) ; *In re City Clerk of Paterson,* 88 *A.* 694, 695–696 (*N. J. Sup. Ct.* 1913—not officially reported) ; *Gansz v. Johnson,* 9 *N. J. Super.* 565, 567 (*Law Div.* 1950). This does not mean there must be perfect equality between the two ; *Stothers v. Martini,* 6 *N. J.* 560 (1951), held there is not. But it does mean that in judging the validity of a restraint upon eligibility for elective office, we must be mindful that the restraint is upon the right to vote as well. As Mr. Chief Justice Warren said in *Reynolds v. Sims, supra,* 377 *U. S.,* at *p.* 555, 84 *S. Ct.,* at *p.* 1378, 12 *L. Ed. 2d,* at *p.* 523 :

"* * * The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."

Defendant argues that *Stothers v. Martini, supra,* 6 *N. J.* 560, holds the Legislature is unlimited in its prescription of qualifications for an elective office created by statute. He misreads the statement that "It is thus only logical to conclude that since the Legislature has the unrestricted power to provide for elective municipal offices that it also has the power to prescribe reasonable qualifications therefor" (at *p.* 564).

What the Court found to be "unrestricted" was the power to decide whether to create elective municipal offices. The power to prescribe qualifications for such offices was expressly limited by reasonableness: the exclusion from office must not be "arbitrary" (at *p.* 565).

Far from being unrestricted, the power to prescribe qualifications for elective office is sharply limited by the constitutional guaranty of a right to vote. A prescribed qualification for office must relate to the needs of officeholding as such or the special needs of the particular office involved, with the voters free to judge the personal or individual fitness of the candidates who have those basic qualifications. The line separating the basic needs of office from the individual fitness of a candidate, perhaps more easily felt than described, is vital, and the fundamental value involved is best served if the judiciary insists that the reason for the inroad upon the right to vote be real, and clear, and compelling.

## II.

In judging whether the statute exceeds the legislative power to restrict the right to vote, we must first find the need the statute was designed to meet, for only in the light of the statutory objective can the power to legislate be assayed. The same inquiry is also pivotal as to the issue of improper classification, for again the public need must be identified before one can intelligently say whether the class is rational. *Two Guys from Harrison, Inc. v. Furman,* 32 *N. J.* 199, 218 (1960).

Defendant argues that *Stothers v. Martini, supra,* 6 *N. J.* 560, settles this case. Involved was *N. J. S. A.* 40:72–1, a provision of the Walsh Act (commission form of government) which then provided:

"Each member [of the commission] shall have been a citizen and resident of the municipality for at least two years immediately preceding his election, *or shall have voted in such municipality at the two general elections immediately preceding his election.*" (Italics added)

The italicized portion was added by amendment.[2] *L.* 1948, *c.* 21, § 2. Defendant contends that if prior voting over a period of time may be required for office, so too may a period of registration. This would be true, but *Stothers* did not sustain the statute in such terms. Rather *Stothers* dealt with the statute solely as one prescribing a period of *residence,* the italicized amendment having been plainly intended to shorten that period. Thus the opinion concludes (at *p.* 567):

"\* \* \* It *is obviously designed to insure that city commissioners* have at least a rudimentary understanding of local affairs. Indeed, the Constitution itself by providing residence requirements for key officers in the State government has enunciated the principle that the persons who are to make and execute the laws of the State should have a substantial period of residence in this State in order to familiarize themselves with its conditions and needs. Similarly, the persons who are to make the municipal ordinances for the government of a city and who are to supervise the execution of those ordinances should have sufficient residence in the city to know its conditions and needs and be aware of any abuses and inefficiencies that may need correction. The qualifications prescribed by the statute in question are wholly proper."

Hence while *Stothers* would support so much of *Chapter* 84 as requires two years of residence on the thesis that residence assures a rudimentary understanding of local conditions, it does not bear upon the validity of the further requirement of a two-year period of registration. On the contrary, since the required period of residence would supposedly provide an opportunity to become familiar with local problems, the further demand for a two-year period of registration becomes the more baffling.

Registration is familiar in the area of voting itself. It is not a qualification for voting, for the Constitution exhausts that subject in *Article* II. Rather registration is upheld as part of the regulatory machinery intended to protect the right to vote. The reason is that without a suitable method to prepare an authentic list of qualified voters in advance of election

---

[2] This amendment was later withdrawn, *L.* 1953, *c.* 365, § 1, and hence the Walsh Act now speaks literally only in terms of residence.

day, the confusion at the polls and the opportunity for fraudulent ballots might jeopardize the election process. *In re Ray,* 26 *N. J. Misc.* 56, 61, 56 *A. 2d* 761 *(Cir. Ct.* 1947); 29 *C. J. S. Elections* § 37, *p.* 60.

The question then is whether registration can serve a similar role in *Chapter* 84. Quite obviously it cannot. Candidacy for office involves none of the bustle of election day itself. There is ample opportunity to explore a contender's claim of two-year residence. True, a two-year period of registration could assist evidentially in the inquiry, but its aid to administrative convenience is too scant a contribution to the public weal to support the restraint it imposes upon the voters' choice of candidate. Indeed defendant makes no effort to sustain *Chapter* 84 on that basis.

Rather defendant offers as the sole conceivable aim of the statute a purpose to assure the public that the candidate has in fact a sufficient interest in or understanding of public affairs, registration for two years being deemed to evidence a past interest which in turn vouchsafes the candidate's present pretensions. Of course upon that thesis a naturalized citizen could hardly be charged with a lack of interest or understanding because he failed to register when under the law he could not. Thus Gangemi is beyond the asserted reason for the statute, see *American Security & Trust Co. v. Com'rs of District of Columbia,* 224 *U. S.* 491, 32 *S. Ct.* 553, 56 *L. Ed.* 856 (1912); *Church of the Holy Trinity v. United States,* 143 *U. S.* 457, 12 *S. Ct.* 511, 36 *L. Ed.* 226 (1892), but we will assume for present purposes that he remains subject to its letter, and on that premise we will continue with the constitutional issue.

The unusual nature of the qualification before us is evident. The Constitution makes no such demand even of a candidate for Governor, *Art.* V, § I, ¶ 2, or for Senator or Assemblyman, *Art.* IV, § I, ¶ 2. Age, citizenship and residence are familiar in this area. Presumably they offer evidence respectively of maturity, loyalty, and either an acquaintance with local problems or a stake in their solution. The right of suffrage, con-

stitutionally required of legislators, *Art.* IV, § I, ¶ 2, may also be thought appropriate for other officeholding. *Cf. N. J. S. A.* 10:1–1. Other qualifications may arise out of the specialized demands of a particular office. It would be reasonable to require a candidate to be a lawyer, physician, or engineer if the duties of the elective office called for such professional skill. But it is another matter to measure qualifications for elective office by the depth of a candidate's interest in or understanding of public matters whether the test be the length of his registration record or some sophisticated quiz. One can quickly see the room for knavery if that proposition were accepted. As we have said, individual fitness is something the voters decide and the intensity of a candidate's interest is part and parcel of that subject. The Legislature cannot take that issue from them. *Chapter* 84 would do so; it is therefore invalid. See *Cottingham v. Vogt,* 60 *N. J. Super.* 576, 581 (*App. Div.* 1960); *Goetsch v. Philhower,* 60 *N. J. Super.* 582, 586 (*App. Div.* 1960).

### III.

In any event we think it clear that the statutory classification of municipalities is wholly unrelated to the supposed object of *Chapter* 84 and hence the provision in question must fall on that account.

It will be recalled that *Chapter* 84 applies only to (1) a city and then only (2) if the city is of the first class (meaning a city with a population exceeding 150,000; *R. S.* 40:167–2); and even then, only (3) if the city has adopted one of the sundry and somewhat diverse plans authorized by the Faulkner Act. In fact but two municipalities (Jersey City and Newark) meet the triple test of *Chapter* 84. That this is so is not necessarily decisive, since a statute could conceivably deal with a problem peculiar to them because of their population and form of government. At least we cannot be sure that no such situation could arise. But though municipalities may be classified on the basis of population or govern-

mental structure, there must be a rational relation between the class created and the object of the law. *Bucino v. Malone*, 12 *N. J.* 330 (1953); *Wanser v. Hoos*, 60 *N. J. L.* 482 (*E. & A.* 1897). This critical connection cannot be found in Chapter 84. See *State v. Riordan*, 75 *N. J. L.* 16 (*Sup. Ct.* 1907); *Koons v. Board of Com'rs of Atlantic City*, 134 *N. J. L.* 329 (*Sup. Ct.* 1946), affirmed o. b. 135 *N. J. L.* 204 (*E. & A.* 1947).

The purpose of the two-year registration provision being, as we have already said, to assure an adequate interest in or understanding of civic affairs, the question is why like assurance is not equally appropriate to all municipalities; or why, if population is relevant, it should matter that the municipality is or is not a city; or why it should matter whether the municipality has or has not adopted one of the plans of government authorized by the Faulkner Act. We cannot conceive a rational connection between the supposed aim of the law and class of municipalities to which its operation is limited.[3] We cannot understand why a right so fundamental as the right to vote should be thus restricted in two of the State's 567 municipalities because they adopted a Faulkner plan of government. We must therefore find the two-year registration provision is invalid.

FRANCIS, J., joins in this opinion.

PROCTOR, HALL and HANEMAN, JJ., join only in Part III hereof for the reason given in their separate opinion.

---

[3] Earlier we rejected the possibility that the purpose of the two-year registration is to furnish evidence of two years of *residence*. If we assume for present purposes that such was the legislative object, the classification is equally invalid, since that evidentiary technique would be equally appropriate to all municipalities in which a period of residence is required. A two-year residence is required under the Walsh Act (commission form of government), *N. J. S. A.* 40:72–1, and the municipal manager government act with respect to municipalities with a population of 1,000 or more. *N. J. S. A.* 40:81–1. There is no relationship between that supposed object and a Faulkner form of government.

The judgment is reversed and the matter remanded for further proceedings not inconsistent with this opinion.

PROCTOR, HALL and HANEMAN, JJ. (concurring). We join in Part III of the opinion of the court which holds that the requirements of *Chapter* 84, *L.* 1960 (*N. J. S. A.* 40:69A–167.1), arbitrarily differentiate between cities of the first class governed by the Faulkner Act and other municipalities of the State under the Faulkner Act with regard to eligibility to hold public office. Since determination of this issue is all that is required to decide the controversy before us, we see no necessity for a discussion of the other issues set forth in the court's opinion.

JACOBS, J., concurs in result.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*For affirmance*—None.