771 A.2d 1123

GERALD MCCANN, PLAINTIFF-APPELLANT, v. CLERK OF THE
CITY OF JERSEY CITY, DEFENDANT, AND LOUIS MANZO,
DEFENDANT-INTERVENOR-RESPONDENT.

Argued Telephonically April 5, 2001—Decided
April 5, 2001—Filed June 1, 2001.

312

314

*George T. Taite,* argued the cause for appellant (*De Luca & Taite,* attorneys; *Samuel R. De Luca,* on the briefs).

*Karen F. DeSoto,* argued the cause for respondent.

The opinion of the Court was delivered by

STEIN, J.

Petitioner Gerald McCann applied to be a candidate for the office of Mayor of the City of Jersey City, a Faulkner Act municipality, in the May 8, 2001 non-partisan election. The Clerk of Jersey City refused to process McCann's petition on the ground that his candidacy was barred by the disqualification provisions of the Criminal Code, *N.J.S.A.* 2C:51-2d, and the Faulkner Act, *N.J.S.A.* 40:69A-166. McCann brought suit, and the Law Division ordered the Clerk to include McCann on the ballot. The Appellate Division reversed, and we affirmed the Appellate Division in an order dated April 5, 2001. This opinion is issued pursuant to that order.

I

McCann is a former Mayor of Jersey City, having served in that office from 1982-1986 and 1990-1992. In December 1991, during his second administration, McCann was convicted in the United States District Court for the District of New Jersey on fifteen counts of an indictment including charges of mail fraud, wire fraud, false statements to a bank, false statements to the Internal Revenue Service (IRS), income tax evasion and failure to file a tax return. For purposes of this review, we assume that none of the events giving rise to those convictions occurred while McCann was in public office.[1] As a result of his convictions, McCann was required

---

[1] According to the Law Division opinion, "the conduct giving rise to [McCann's] convictions occurred prior to his having become Mayor." *McCann v. Clerk of the City of Jersey City,* Docket No. L-1322-01 (Law Div. March 13, 2001) (slip op. at 2). We accept that statement for purposes of our review because its

to forfeit his office pursuant to *N.J.S.A.* 2C:51–2a(1), which provides for the forfeiture of any public office in this State on conviction of an offense involving dishonesty or a crime of the third-degree or above, or the conviction of an equivalent offense under federal law.

The federal court sentenced McCann in June 1992 to a term of thirty-three months imprisonment followed by a three-year period of supervised release. In February 1997, while on supervised release, McCann announced his intention to run for Mayor of Jersey City in the 1997 election. However, because he was disqualified from voting while serving his federal sentence, the Chancery Division and Appellate Division held that he was barred from running. *McCann v. Superintendent of Elections,* 303 *N.J.Super.* 371, 696 *A.*2d 1134 (Ch.Div.), *aff'd,* 303 *N.J.Super.* 352, 696 *A.*2d 1124 (App.Div.), *certif. denied,* 149 *N.J.* 139, 693 *A.*2d 109 (1997).

After completing his sentence, and with his voting rights restored, McCann again sought to run for Mayor of Jersey City, filing a petition in February 2001 with the City Clerk for the May 8, 2001 election. Based on advice from Jersey City's Corporation Counsel, the Clerk refused to process McCann's petition because his 1991 convictions disqualified him from the office of Mayor under the disqualification provisions of the Criminal Code, *N.J.S.A.* 2C:51–2d, and the Faulkner Act, *N.J.S.A.* 40:69A–166. The Criminal Code disqualifies from public office "any person convicted of an offense involving or touching on his public office, position or employment." *N.J.S.A.* 2C:51–2d. The Faulkner Act prohibits "[a]ny person convicted of a crime or offense involving moral turpitude [from assuming] any municipal office, position or

---

accuracy is not critical to the outcome of this case. However, we note that at McCann's February 7, 1992 forfeiture-of-office hearing in the Law Division the State maintained that two of the counts for which he was convicted, dealing with IRS violations, "did occur while he was in office. Specifically, Count 13 dealing with the filing of a false corporate tax return in June of 1990; and Count 15 dealt with providing false statements to an IRS Agent in July of 1990." McCann did not dispute those facts at the 1992 hearing.

employment in a municipality governed pursuant to this act." *N.J.S.A.* 40:69A–166.

McCann filed a complaint in the Law Division seeking a declaratory judgment that he was eligible to run for office. The Law Division rejected both of the City Clerk's arguments for disqualifying McCann and ordered the Clerk to process McCann's petition. The court held that the forfeiture statute in the Criminal Code did not apply to McCann's offenses because those offenses occurred while McCann was in the private sector. With respect to the Faulkner Act, the court acknowledged that the disqualification provision contained in the Faulkner Act would bar McCann's candidacy if it was enforceable but, relying on *Matthews v. Atlantic City*, 84 *N.J.* 153, 417 *A.*2d 1011 (1980), held that the provision deprived McCann of his constitutional right to equal protection because it subjects candidates for mayor in Faulkner Act municipalities to stricter eligibility requirements than those that apply in non-Faulkner Act municipalities, without any rational basis for the distinction.

The Appellate Division reversed. 338 *N.J. Super.* 509, 770 *A.*2d 723 (App.Div.2001). With respect to the forfeiture statute, the Appellate Division acknowledged that no prior cases addressed the specific question presented by McCann-whether the statute applied to crimes that occurred while the candidate was not in office. However, the court cited language from related cases "indicat[ing] that such conduct may indeed warrant a person being forever barred from public employment," *id.* at 517, 770 *A.*2d 723, and concluded that "the Forfeiture Statute was intended to preclude anyone who violated the public trust from obtaining a second opportunity to do so." *Id.* at 518, 770 *A.*2d 723. The court also rejected the Law Division's conclusion that the Faulkner Act disqualification provision was unconstitutional. Relying in large part on the legislative history of the Act, the court observed that the Act "intended to confer the greatest possible power of self-government, consistent with the New Jersey Constitution, upon municipalities adopting a plan pursuant to the Act." *Id.* at 527, 770

A.2d 723 (citing *City of Newark v. Dep't of Civil Serv.*, 68 *N.J.Super.* 416, 424, 172 *A.2d* 681 (App.Div.1961)). "Given the broad, unprecedented sweep of powers the Legislature ultimately put in the hands of mayors and other elected officials in these newly configured municipalities," the court noted, "it is not unexpected that it also sought to regulate those who would exercise those powers." *Id.* at 531, 770 *A.2d* 723. The court concluded that the disqualification provision was reasonable, and therefore constitutional, "given the broad scope of power vested in the mayor and other elected officials of those municipalities." *Id.* at 533, 770 *A.2d* 723

We granted McCann's petition for certification and motion for acceleration, and heard oral argument by telephone on April 5, 2001. Later that day, we issued an order affirming the judgment of the Appellate Division and vacating the stay of the printing of affected election ballots. This opinion is issued to supplement our April 5, 2001 order.

## II

We address first whether McCann's candidacy is barred by the forfeiture statute in the Criminal Code, *N.J.S.A.* 2C:51–2. That statute provides in relevant part:

a. A person holding any public office, position, or employment, elective or appointive, under the government of this State or any agency or political subdivision thereof, who is convicted of an offense shall forfeit such office or position if:

(1) He is convicted under the laws of this State of an offense involving dishonesty or of a crime of the third degree or above or under the laws of another state or of the United States of an offense or a crime which, if committed in this State, would be such an offense or crime;

(2) He is convicted of an offense involving or touching such office, position or employment; or

(3) The Constitution of a statute other than the code so provides.

. . . .

d. In addition to the punishment prescribed for the offense, and the forfeiture set forth in subsection a. of N.J.S. 2C:51–2, *any person convicted of an offense involving or touching on his public office, position or employment shall be forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions.*

[*N.J.S.A.* 2C:51–2 (emphasis added).]

As noted, McCann was ordered in 1992 to forfeit his position as Mayor of Jersey City pursuant to *N.J.S.A.* 2C:51–2a because he was convicted of crimes involving dishonesty or of the third-degree or higher while he was in office. The first question for our review is whether McCann's convictions for offenses committed while McCann was not serving as Mayor "involv[ed] or touch[ed] on his public office, position, or employment." *N.J.S.A.* 2C:51–2d. If so, he "shall be forever disqualified" from holding any public office in this State. *Ibid.* The question is one of first impression.

 Our overriding objective in determining the meaning of a statute is to "effectuate the legislative intent in light of the language used and the objects sought to be achieved." *State v. Hoffman,* 149 *N.J.* 564, 578, 695 *A.*2d 236 (1997). "Ordinarily, the language of the statute is the surest indicator of the Legislature's intent," *Cornblatt v. Barow,* 153 *N.J.* 218, 231, 708 *A.*2d 401 (1998), and if the statutory language " 'clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms.' " *SASCO 1997 NI, LLC v. Zudkewich,* 166 *N.J.* 579, 586, 767 *A.*2d 469 (2001) (quoting *New Jersey Dep't of Law & Pub. Safety v. Bigham,* 119 *N.J.* 646, 651, 575 *A.*2d 868 (1990)). "In addition to the provision in question, we also consider the overall legislative scheme. 'Our task is to harmonize the individual sections and read the statute in the way that is most consistent with the overall legislative intent.' " *Ibid.* (quoting *Fiore v. Consol. Freightways,* 140 *N.J.* 452, 466, 659 *A.*2d 436 (1995)).

 The language of *N.J.S.A.* 2C:51–2d, considered in the context of the entire statute, suggests that a conviction does not "involve[ ]" or "touch[ ] upon" a public office unless the facts underlying the conviction bear some direct relationship to an office held by the individual. Subsection (a) of the statute, which specifies the circumstances under which a person currently holding public office must surrender that position, sets forth two separate standards. Subsection (a)(1) requires forfeiture where the office holder is convicted "of an offense involving dishonesty or of a

crime of the third degree or above." *N.J.S.A.* 2C:51–2a(1). Subsection (a)(2) requires forfeiture where the office-holder "is convicted of an offense involving or touching such office, position or employment." *N.J.S.A.* 2C:51–2a(2). The latter standard, but not the former, is duplicated in subsection (d).

That the Legislature included two distinct standards for forfeiture of office demonstrates that a substantive distinction must exist between crimes merely "involving dishonesty" and those "involving or touching on" an office. The Appellate Division determined that McCann's convictions were for offenses "involving or touching on" his office as Mayor of Jersey City because the offenses "demonstrate his untrustworthiness and disrespect for government agencies." 338 *N.J. Super.* at 523, 770 *A.*2d 723. In our view, the Appellate Division's construction is too broad because it renders the subsection (a)(1) standard superfluous-any crime "involving dishonesty or . . . of the third degree or above," *N.J.S.A.* 2C:51–2a(1), would also, presumably, demonstrate "untrustworthiness and disrespect for government agencies." "It is a cardinal rule of statutory construction that full effect should be given, if possible, to every word of a statute. We cannot assume that the Legislature used meaningless language." *Gabin v. Skyline Cabana Club*, 54 *N.J.* 550, 555, 258 *A.*2d 6 (1969).

The operative distinction between the "involving dishonesty" and "involving or touching on" standards can be found in the Legislature's decision to limit permanent disqualification from office only to those persons *"convicted of an offense involving or touching on his public office." N.J.S.A.* 2C:51–2(d) (emphasis added). That phrase implies, in our view, a determination on the part of the Legislature to limit the scope of the disqualification provision to crimes that are related directly to an individual's performance in, or circumstances flowing from, a specific public office or position held by that individual. When an individual commits a crime wholly unrelated to his or her public office, the crime ordinarily cannot be characterized as involving or touching on the public office.

As noted, the Law Division found that the conduct relating to McCann's convictions took place while he was in the private sector, and there is no indication that the offenses bore any direct relationship to his responsibilities as Mayor of Jersey City between 1982-1986 and 1990-1992. The only argument proffered is that McCann violated the public trust when he committed his offenses, and that the magnitude of his abuse of the public trust necessarily bears on the responsibilities of a mayor. We do not dispute that McCann's conduct reveals qualities that are relevant to his fitness for the office of Mayor. However, our inquiry under subsection (d) is limited to determining whether McCann's offenses touched upon either of his specific tenures as Mayor of Jersey City, and there is no indication in the record that any direct relationship exists between the offenses and his mayoral responsibilities. We therefore conclude that McCann is not subject to disqualification under *N.J.S.A.* 2C:51–2d.

The Appellate Division relied heavily on *Moore v. Youth Correctional Institute,* 119 *N.J.* 256, 574 *A.*2d 983 (1990), but we find that case distinguishable. *Moore* involved a corrections officer who, after being disciplined for harassing prison inmates, placed threatening telephone calls to the officer who prosecuted him at the disciplinary hearings and visited that officer's home on several occasions, at one point parking his car on the officer's lawn and racing his motor. *Id.* at 261, 574 *A.*2d 983. The narrow question in *Moore* was whether conduct committed during non-business hours and off the premises of the correctional facility at which Moore was employed could be considered to involve or touch on his employment for purposes of forfeiture. *Id.* at 269, 574 *A.*2d 983. In determining that it could, we noted that "[w]hen the infraction casts a shadow over the employee as to make his or her continued service appear incompatible with the traits of trustworthiness, honesty, and obedience to law and order, then forfeiture is appropriate." *Id.* at 270, 574 *A.*2d 983. Read in exclusion, that statement could be understood to support the Appellate Division's construction of subsection (d). However, the language of *Moore* should be

understood in the context of the facts critical to our disposition, and it was undisputed that the petitioner's harassment of his co-employee in *Moore* bore a direct and substantial relationship to their respective governmental positions.

Likewise, the other principal decisions relied on by the Appellate Division, *State v. Botti*, 189 *N.J.Super.* 127, 458 *A.*2d 1333 (Law Div.1983) and *State v. Musto*, 187 *N.J.Super.* 264, 454 *A.*2d 449 (Law Div.1982), *aff'd o.b.*, 188 *N.J.Super.* 106, 456 *A.*2d 114 (App.Div.1983), are not inconsistent with our disposition. *Botti*, like the present case, involved a mayor who was convicted of mail fraud and tax evasion, but the offending conduct occurred prior to his assuming office. However, *Botti* held that forfeiture was warranted under subsection (a)(1) of the forfeiture statute because Botti was convicted of a crime "involving dishonesty"; the court specifically did not resolve the question whether the individual's conduct involved or touched on his office for purposes of subsections (a)(2) or (d). *Botti, supra*, 189 *N.J.Super.* at 132, 458 *A.*2d 1333. Similarly, *Musto* involved a state senator and mayor who was convicted of various federal offenses, including mail fraud and tax fraud. *Musto, supra*, 187 *N.J.Super.* at 269, 454 *A.*2d 449. However, the conduct underlying those offenses occurred while Musto was in public office, and the *Musto* court's analysis was limited to determining whether Musto's offenses would have resulted in convictions under state law for purposes of *N.J.S.A.* 2C:51–2a(1), *id.* at 271–82, 454 *A.*2d 449, and whether the forfeiture statute was constitutional. *Id.* at 282–320, 454 *A.*2d 449. The question whether the offenses in *Musto* involved or touched on Musto's public offices was not implicated in the court's review.

Without question, McCann's crimes "involve dishonesty" for purposes of the forfeiture statute and properly resulted in his forfeiture of the office of Mayor of Jersey City in 1992. However, the standard for permanent disqualification is a higher one, and on the record before us we conclude that *N.J.S.A.* 2C:51–2d does not

mandate McCann's permanent disqualification from public office in this State.[2]

## III

Nevertheless, we conclude that the disqualification provision of the Faulkner Act, *N.J.S.A.* 40:69A–1 to –149 (also known as the Optional Municipal Charter Law), bars McCann's candidacy. The Faulkner Act is an elective statutory scheme that authorizes participating municipalities to choose between four plans of government that are set forth in the Act. Article 17 of the Act contains a series of mandatory provisions that are common to all of the optional plans, and the disqualification provision of the Faulkner Act is one of the common provisions. It states as follows:

*Any person convicted of a crime or offense involving moral turpitude shall be ineligible to assume any municipal office, position or employment in a municipality governed pursuant to this act, and upon conviction thereof while in office shall forfeit his office;* provided, however any person convicted of such an offense who has achieved a degree of rehabilitation which in the opinion of the appointing authority and the Civil Service Commission, as to employment subject to the Civil Service law, indicates his employment would not be incompatible with the welfare of society and the aims and objectives of the governmental agency, may be considered eligible to apply for employment or be continued in employment. Any person who shall violate any of the provisions of sections 17-14, 17-15, or 17-16 of this article shall upon conviction thereof in a court of competent jurisdiction forfeit his office.

[*N.J.S.A.* 40:69A–166 (emphasis added) (footnotes omitted).[3]]

---

[2] As noted, *supra* at 316–17 n. 1, 771 *A*2d at 1126 n. 1, although the trial court found that the facts underlying McCann's convictions took place during a period in which he was not in office, the underlying record is not clear on that point, and the expedited manner in which this case was brought before the Law Division precluded a more rigorous fact-finding than might otherwise have occurred. We base our disposition of the *N.J.S.A.* 2C:51–2 issue on the findings made by the Law Division.

[3] McCann also argues that the statute's rehabilitation clause saves his candidacy, but we find little merit to that argument. The office of Mayor of Jersey City is not subject to the oversight of the Civil Service Commission or any other "appointing authority" who can offer an opinion respecting the rehabilitation of a mayoral candidate. McCann argues, however, that the public can be considered the "appointing authority" for purposes of the statute, such that if a candidate succeeds in an election it can be inferred that the public has deter-

Because Jersey City is a Faulkner Act municipality, McCann is subject to the *N.J.S.A.* 40:69A–166 standard. McCann concedes that his convictions constitute crimes "involving moral turpitude" for purposes of the statute. However, he argues that the statute deprives him of equal protection of the laws in violation of the United States and New Jersey Constitutions because it subjects him, and other Faulkner Act candidates, to a different standard for disqualification than the standard imposed on municipal candidates generally pursuant to *N.J.S.A.* 2C:51–2d. We hold that the disqualification standard imposed on Faulkner Act municipalities pursuant to *N.J.S.A.* 40:69A–166 is supported by sound public policy justifications and withstands constitutional scrutiny.

## A

The United States and New Jersey Constitutions impose independent restraints on the Legislature's power to hold citizens to different legal standards. As we noted in *Drew Associates of N.J. v. Travisano*, 122 *N.J.* 249, 584 *A.*2d 807 (1991), "[f]ederal equal-protection analysis employs different tiers of review: strict scrutiny when an act involves a fundamental right or a suspect class; intermediate scrutiny when an act involves a semi-suspect class; and minimal rational-basis scrutiny in all other cases." *Id.* at 258, 584 *A.*2d 807. The federal standard for review in this case clearly is rational basis scrutiny. That there is no fundamental right to be a candidate for public office is well-settled, *Bullock v. Carter*, 405 *U.S.* 134, 142–43, 92 *S.Ct.* 849, 855–56, 31 *L.Ed.* 2d 92, 99 (1972); *Turner v. Fouche*, 396 *U.S.* 346, 90 *S.Ct.* 532, 24 *L.Ed.* 2d 567 (1970); *Matthews v. Atlantic City*, 84

---

mined that "his employment would not be incompatible with the welfare of society and the aims and objectives of the governmental agency." *N.J.S.A.* 40:69A–166. We disagree. In our view, the most sensible reading of the statutory language indicates that the clause applies only to municipal employees who are appointed to their positions. Because mayors are elected and are therefore not subject to an "appointing authority" or the Civil Service Commission, they are permanently disqualified from elected office if they commit crimes contemplated by the disqualification statute.

*N.J.* 153, 168, 417 *A*.2d 1011 (1980), and *N.J.S.A.* 40:69A–166 does not create a suspect classification. Thus, *N.J.S.A.* 40:69A–166 will violate the United States Constitution "only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." *McGowan v. Maryland,* 366 *U.S.* 420, 425, 81 *S.Ct.* 1101, 1105, 6 *L.Ed.* 2d 393, 399 (1961).

 Our state equal protection standard, however, is somewhat more stringent. We have rejected the federal multi-tiered approach in favor of a less rigid balancing approach in which we consider "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Greenberg v. Kimmelman,* 99 *N.J.* 552, 567, 494 *A*.2d 294 (1985). *Accord Right to Choose v. Byrne,* 91 *N.J.* 287, 309, 450 *A*.2d 925 (1982); *Taxpayers Ass'n v. Weymouth Township,* 80 *N.J.* 6, 43, 364 *A*.2d 1016 (1976). We discussed our equal protection analysis in the specific context of election restrictions in *Matthews v. Atlantic City, supra,* 84 *N.J.* 153, 417 *A*.2d 1011. In *Matthews,* the Court struck down a two-year residency requirement that applied to municipalities organized under the Walsh Act, *N.J.S.A.* 40:70 to -76. That requirement stood in contrast to the "vast majority" of other municipalities in the State at that time that imposed "no durational residency requirement for candidacy." *Matthews, supra,* 84 *N.J.* at 172, 417 *A*.2d 1011. The petitioner in *Matthews* argued, similarly to McCann, that the more onerous residency requirement in his municipality was not supported by a sufficient public policy justification to satisfy equal protection standards.

The *Matthews* Court began its discussion of the level of scrutiny afforded under the State equal protection standard by noting that

the impact of a durational residency requirement for candidates on the right to vote, although indirect, is nevertheless a significant intrusion into the voter's freedom of choice. Since a residency requirement limits the number of potential candidates, there is an infringement of the right to vote despite the absence of discrimination against a particular class of voters. At the same time, we recognize the importance of legislative interests in maintaining the integrity of the electoral process.

[*Id.* at 169, 417 *A.*2d 1011.]

The Court balanced those competing considerations by fashioning the following standard for review: "To permit the furtherance of these interests without unduly restricting the electorate's freedom of choice, we hold that a requirement or restriction for candidates for elective office must be reasonably and suitably tailored to further legitimate governmental objectives." *Ibid.*

In developing that standard, the Court relied in large part on *Gangemi v. Rosengard,* 44 *N.J.* 166, 207 *A.*2d 665 (1965). In *Gangemi,* the plaintiff challenged the Faulkner Act requirement that certain Faulkner Act elected officers be "registered voters" for at least two years. *N.J.S.A.* 40A:69A–167.1. The provision applied to only cities exceeding 150,000 in population that adopted one of the Act's plans. *Ibid.* In holding that the provision violated equal protection principles, the Court noted that it could not "conceive a rational connection between the supposed aim of the law and class of municipalities to which its operation is limited." *Gangemi, supra,* 44 *N.J.* at 175, 207 *A.*2d 665.

Following *Gangemi,* the *Matthews* Court concluded that the Walsh Act residency requirement deprived Walsh Act candidates of equal protection. The Court recognized that durational residency requirements serve a valid public purpose of "[p]rotecting the integrity of the ballot." *Id.* at 170, 417 *A.*2d 1011. However, the Court found that the justification for the residency requirement in the Walsh Act "lose[s] meaning when it is observed that the statute applies to only 40 out of 567 municipalities in the State with commission form of government." *Id.* at 171, 417 *A.*2d 1011 (citing Fitzgerald, *Legislative Manual* 891-904 (1980)). The Court rejected the State's argument that the two-year requirement was justified with respect to Walsh Act municipalities but not other forms of municipal government because Walsh Act commissioners possessed more powers than those in other municipalities. "There has been no showing that because of the structure of the governing body in Walsh Act municipalities, an additional two years is reasonably necessary for a candidate to become familiar with local

problems or for the voters to become familiar with the candidate." *Id.* at 172–73, 417 *A.*2d 1011. The Court concluded, therefore, that because the State "failed to provide any sound justification why municipalities under the Walsh Act and other local forms of local government should be treated differently," *id.* at 173, 417 *A.*2d 1011, the Walsh Act residency requirement was unconstitutional.

## B

Examination of the Faulkner Act's delegation of powers to municipalities in general, and mayors specifically, makes clear that there exists, in the context of this appeal, a "sound justification" for the heightened disqualification standard in *N.J.S.A.* 40:69A–166. *Matthews, supra,* 84 *N.J.* at 173, 417 *A.*2d 1011. Accordingly, we are satisfied that *N.J.S.A.* 40:69A-166 does not violate McCann's constitutional right to equal protection.

The Faulkner Act "was created with the intent to confer upon municipalities the greatest possible power of local self-government consistent with the Constitution of this State.... Municipalities that adopted one of the Faulkner Act plans have been granted wide authority to determine the organization of departments and to control personnel." *Casamasino v. City of Jersey City,* 158 *N.J.* 333, 342–43, 730 *A.*2d 287 (1999) (citations omitted). Accordingly, Section 30 of the Act provides:

> Any specific enumeration of municipal powers contained in this act or in any other general law shall not be construed in any way to limit the general description of power contained in this article, and any such specifically enumerated municipal powers shall be construed as in addition and supplementary to the powers conferred in general terms by this article. All grants of municipal power to municipalities governed by an optional plan under this act, whether in the form of specific enumeration or general terms, shall be liberally construed, as required by the Constitution of this State, in favor of the municipality.
>
> [*N.J.S.A.* 40:69A–30.]

Prior to the passage of the Faulkner Act, municipalities had the option of organizing their governments according to the city, town, borough, township, village and commission forms that derived from English and colonial practices and were codified by statute in

the nineteenth and early twentieth centuries. *See* 34 *New Jersey Practice, Local Government Law* §§ 4.2–4.9 (Michael A. Pane) (rev. 3d ed. 1999). "The essential common feature of all these older forms of government is that there is no distinction between executive and administrative functions and there is no strong chief executive." *Id.* at § 4.9. In 1948, the Legislature created a nine-member Commission on Municipal Government to offer recommendations for legislation that would "move New Jersey municipal government to a strong foundation based on institution of the most modern forms of municipal government possible, particularly forms in which the Chief Executive would either be a powerful independently elected strong mayor, or a powerful appointed professional manager." *Id.* at § 4.10.

The February 1950 *Second Report of the Commission on Municipal Government* served as a blueprint for the Faulkner Act. *See L.* 1950, *c.* 210 (statement) ("This is the principal bill intended to carry out the recommendations contained in the [Report]"). The second article of the Report, which concerns municipal incorporation and powers, states that it "establishes practical inducements to charter improvement, by offering municipalities extensive powers of local self-government and relief from the need for specific legislative approval to undertake new or different municipal services." New Jersey Commission on Municipal Government, *Local Self Government: A Proposed Optional Charter Plan (Second Report)* 2 (1950). The Report goes on to describe the "New Powers" enjoyed by municipalities that elect to adopt one of the four plans contained in the Act:

> The act would grant broad new powers to municipalities governed by any of the optional forms:
>
> (1) The new powers are stated in general terms rather than by specific enumeration, so as to provide the maximum home rule under the new Constitution.
>
> (2) The provisions of the new Constitution intended to broaden the legal powers of local government are given legislative effect.
>
> (3) Although municipal government still remains subject to the control of the Legislature as required by the new Constitution, legislative control is expressed in a broad and complete authorization which leaves the widest possible discretion with each municipality to determine the organization of its departments, the compensa-

tion of its officers and employees, the range and character of its services, subject to the provisions of general law which apply to all municipalities.
[*Id.* at 3.]

As noted, the Faulkner Act creates four optional forms of municipal government—the mayor-council plan, *N.J.S.A.* 40:69A–31 to –67; the council-manager plan, *N.J.S.A.* 40:69A–81 to –98; the small municipality plan, *N.J.S.A.* 40:69A–115 to –132; and the mayor-council-administration plan, *N.J.S.A.* 40:69A–149.1 to –149.16. Each Faulkner Act form of government "divides up the 'bundle of rights' [afforded under the Constitution] differently, presumably so as to be the most effective in meeting the needs of a municipality's inhabitants." 34 *New Jersey Practice, supra,* § 4.15. Jersey City has adopted the Faulkner mayor-council plan. That plan is distinguishable from the other options because it is "quite close to the presidential or gubernatorial form in its concentration of power in the hands of a highly-visible, independently-elected Chief Executive who has substantial power over the administration." *Ibid.* The mayor in a Faulkner mayor-council plan is elected by popular vote to a four-year term. *N.J.S.A.* 40:69A–33. Once elected, the mayor is empowered to, among other things, "[s]upervise, direct and control all departments of the municipal governments," prepare and submit the annual budget, "[s]upervise the care and custody of all municipal property, institutions and agencies," "[s]ign all contracts, bonds or other instruments requiring the consent of the municipality," "[n]egotiate contracts for the municipality," appoint the heads of all administrative departments, and approve or veto all municipal ordinances. *N.J.S.A.* 40:69A–40, –41. In addition, if elected council members desire to communicate with municipal employees in a mayor-council municipality, they must do so "solely through the mayor or his designee." *N.J.S.A.* 40:69A–37.1.

The mayor's authority under the Faulkner Act's mayor-council plan is, therefore, substantial, and "[i]t is no accident that this plan has been adopted by virtually all of New Jersey's largest municipalities—places in which there is a need for visible, effective leadership to pursue programs with the full support of the admin-

istration." 34 *New Jersey Practice, supra,* § 4.16. It is also no accident that when the Legislature passed the Faulkner Act, it felt compelled to qualify the broad grant of powers to municipalities generally, and to mayors specifically, with a heightened standard of ethical responsibility. The office of Mayor in Jersey City, as in other large cities that have adopted the Faulkner Act, is one of the most powerful municipal offices in this State, created pursuant to a law that was designed to provide municipalities with unique authority and flexibility to organize municipal governments according to local preferences. We are persuaded that the Act's requirement of disqualification from municipal office for those persons convicted of "crimes involving moral turpitude," *N.J.S.A.* 40:69A–166, is "reasonably and suitably tailored to further [the] legitimate governmental objective[ ]" of ensuring that the powers granted by the Act are exercised conscientiously. *Matthews, supra,* 84 *N.J.* at 169, 417 *A*.2d 1011.

 Our conclusion is reinforced by consideration of the historical relationship between *N.J.S.A.* 40:69A–166 and the forfeiture statute in the criminal code. At the time the Faulkner Act was passed, the forfeiture statute provided as follows:

> Any person holding an office, elective or appointive, under this State, or any county or municipality thereof, who shall be convicted upon, or who shall plead guilty, non vult or nolo contendere to, an indictment or allegation charging such person with the commission of a misdemeanor or high misdemeanor touching the administration of his office, or which involves moral turpitude, shall forfeit such office and cease to hold the same from the date of such conviction or entry of such plea as aforesaid.
>
> [*L.* 1913, *c.* 74, § 1.]

Thus, at the time the Faulkner Act was passed, the forfeiture statute apparently mandated that a person in McCann's position, who committed an offense involving "moral turpitude" that resulted in forfeiture, would be precluded from holding that specific office again. That provision of the forfeiture statute would have produced the same result as now confronts McCann under the Faulkner Act. To conclude that the Faulkner Act would have been constitutional when it was adopted, but was then rendered unconstitutional when the Legislature narrowed the scope of the forfei-

ture statute by enacting *N.J.S.A.* 2C:51–2 in its present form, would indeed be peculiar. A state "need not run the risk of losing an entire [legislative] scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." *McDonald v. Bd. of Election Comm'rs,* 394 *U.S.* 802, 808–09, 89 *S.Ct.* 1404, 22 *L.Ed.* 2d 739 (1969). Rather, a legislature may regulate "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical Inc.,* 348 *U.S.* 483, 489, 75 *S.Ct.* 461, 465, 99 *L.Ed.* 563, 573 (1955). The Legislature's action in amending the forfeiture statute cannot serve as a basis for rendering unconstitutional a provision of the Faulkner Act that clearly was constitutional prior to the Legislature's action.

Finally, we note the dissent's argument that *N.J.S.A.* 40:69A–166 does not support a rational state interest because, although it might be rational as applied to powerful public offices such as Mayor of Jersey City, the statute extends further and applies to all municipal positions in Faulkner Act jurisdictions, including positions that do not involve the exercise of unique authority. *Post* 167 *N.J.* at 338–39, 771 *A.*2d at 1139–40. In advancing that argument, the dissent discounts the unprecedented flexibility in organizing the operations of municipal government that the Faulkner Act bestowed on officials at the municipal level. We find that the Legislature's insistence that higher ethical standards accompany those powers of organization is a reasonable one. On a more basic level, however, we emphasize that McCann was not running for a seat on a municipal council, or for the office of mayor in a municipality where the mayor's powers are relatively limited. McCann sought election to the office of Mayor of Jersey City, a municipality that bestows the maximum power on its chief executive office that is authorized by statute. We are mindful of the dissent's concern that the Faulkner Act might pose closer constitutional questions as applied to less influential municipal offices, but we need decide only the case before us. The Faulkner Act does not violate McCann's right to equal protection of the laws.

## IV

In accordance with our April 5, 2001 order, we affirm, as modified, the judgment of the Appellate Division.

COLEMAN, J., concurring in part and dissenting in part.

I concur in the Court's determination in Point III of its opinion that petitioner Gerald McCann is barred by the Faulkner Act, *N.J.S.A.* 40:69A–166, from becoming a candidate for the office of Mayor of the City of Jersey City. I disagree with the Court's conclusion in Point II that the New Jersey Code of Criminal Justice's disqualification provision, *N.J.S.A.* 2C:51–2d, does not similarly bar him from running for the office of Mayor. I would, therefore, affirm the judgment of the Appellate Division barring his candidacy under both statutory schemes substantially for the reasons expressed by Judge Petrella in his well-reasoned opinion.

LONG and LaVECCHIA, JJ., concurring and dissenting.

We would reverse the judgment of the Appellate Division substantially for the reasons expressed in the persuasive opinion of Judge D'Italia. The trial court granted judgment to plaintiff, Gerald McCann directing the City Clerk to process in accordance with applicable law McCann's petition to be a candidate for Mayor of Jersey City in the May 8, 2001 nonpartisan election. The court concluded that although McCann's earlier conviction, while serving as mayor of Jersey City in 1991, warranted his removal from office, it did not work a permanent disqualification under the Forfeiture Act, *N.J.S.A.* 2C:51–2. According to the trial court that disability is reserved for those whose criminal conviction is for "an offense involving or touching on his public office, position or employment." *N.J.S.A.* 2C:5–2d. The court found that because the acts that formed the basis of the crime were committed before McCann became mayor, his crime did not "touch" or "involve" his office.

The trial court also considered the alternative grounds urged as a bar to McCann's holding public office: the forfeiture provision of the Faulkner Act, *N.J.S.A.* 40:69A–166. That section provides:

Any person convicted of a crime or offense involving moral turpitude shall be ineligible to assume any municipal office, position or employment in a municipality governed pursuant to this act, and upon conviction thereof while in office shall forfeit his office. . . .

The trial court concluded that the Faulkner Act's forfeiture provision is applicable on its face because Jersey City is a Faulkner Act municipality and McCann's crimes certainly involved moral turpitude. However, relying on *Matthews v. City of Atlantic City*, 84 *N.J.* 153, 417 *A.2d* 1011 (1980), and *Gangemi v. Rosengard*, 44 *N.J.* 166, 207 *A.2d* 665 (1965), the court concluded that *N.J.S.A.* 40:69A–166 is unconstitutional as applied to McCann. The statute was found to violate equal protection because it subjects candidates for mayor in Faulkner Act municipalities to stricter eligibility requirements than are applicable in other municipalities with no discernible and persuasive justification for the disparate treatment.

On appeal by Louis Manzo, a rival candidate for mayor, the Appellate Division reversed on both grounds. Notwithstanding that McCann's criminal conduct took place before he became mayor, the court concluded that his conviction nonetheless "touched on his public office" because the conviction occurred while McCann held public office and because his offenses were of such character as to "demonstrate his untrustworthiness and disrespect for government agencies," thereby rendering "suspect any future service by McCann to the State or its subdivisions in any capacity." 338 *N.J.Super.* 509 at 523, 770 *A.2d* 723 (App.Div. 2001). The Appellate Division also concluded that the Faulkner Act bars McCann from again holding public office in Jersey City.

The matter comes before the Court on an emergent appeal by McCann. The Court has rejected his appeal by the slimmest of margins, three to two. Two members of the three person majority have rejected the argument that McCann is ineligible to be a candidate for the office of mayor of Jersey City by dint of the

Forfeiture Act, *N.J.S.A.* 2C:51–2d. We concur in their disposition of that issue. We dissent, however, from the holding of the majority that the Faulkner Act's forfeiture provision disqualifies McCann, for all time, from holding public office or employment in--and only in--Faulkner Act municipalities because his criminal activities constituted crimes of moral turpitude. We write to add the following.

I.

The contention is that a criminal act must be considered to "touch" an office if the *conviction* of criminality occurs during the occupancy of public office by the felon, and if the underlying crime is such as to reflect so adversely on the character and integrity of the actor that no reasonable person would be confident in his ever again wielding government power. That argument is flawed in several respects.

First, the argument does not fit the language, design, and legislative intent underlying *N.J.S.A.* 2C:51–2d. *N.J.S.A.* 2C:51–2 requires the forfeiture of office when the holder is convicted of a crime of dishonesty, whether or not the criminal act takes place during the period of office holding. *N.J.S.A.* 2C:51–2a(1). By its own terms, the person convicted must be in office at the time of conviction. Otherwise, there is nothing to forfeit. That is the extent of the congruity of office holding and conviction in *N.J.S.A.* 2C:51–2. There is nothing in the language of the statute to indicate that the Legislature intended that the coincidence of office holding and conviction should have consequence beyond forfeiture of present office, namely the future ineligibility to hold office under subsection d. That is not what the Legislature intended by its use of the phrase "involving or touching on his public office."

The legislative intent in using that phrase was obviously to differentiate between those convicted of crimes of dishonesty during office, *N.J.S.A.* 2C:51–2a(1), who forfeit that office upon conviction, and those "convicted of an offense involving or touching such office, position or employment," who not only forfeit that

office upon conviction, *N.J.S.A.* 2C:51–2a(2), but are thereafter precluded from again holding public office, *N.J.S.A.* 2C:51–2d. The Appellate Division's expansive reading of the phrase "touching on his public office" renders *N.J.S.A.* 2C:51–2a(2) mere surplusage because it would not matter whether a crime of dishonesty actually employed the trappings of office in its execution if the same result obtained: permanent preclusion from future office holding under *N.J.S.A.* 2C:51–2d. The Legislature obviously intended to distinguish between two classes of felons, those who commit dishonest acts, and those who use their office to do so. We must respect that legislative classification because the distinction it makes seems both sensible and real. *Taxpayers Ass'n of Weymouth Township v. Weymouth Township,* 80 *N.J.* 6, 43, 364 *A.*2d 1016 (1976), *cert. denied sub nom., Feldman v. Weymouth Township,* 430 *U.S.* 977, 97 *S. Ct.* 1672, 52 *L. Ed.* 2d 373 (1977) (concluding that "New Jersey has always required a real and substantial relationship between the classification and the governmental purpose which it purportedly serves").

We decline to blur, indeed obliterate, the distinction. Yet, that is the result of the Appellate Division's holding, which, we note, resorts to our prior decision in *Moore v. Youth Correctional Institute,* 119 *N.J.* 256, 269, 574 *A.*2d 983 (1990), as support for its view, although a fair reading of that case reveals that it, like *State v. Botti,* 189 *N.J.Super.* 127, 458 *A.*2d 1333 (Law Div.1983), is indeed entirely distinguishable on its facts. Instead, we read the statute sensibly, and give effect to its plain meaning. *Merin v. Maglaki,* 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992) (stating that "primary task for the Court is to 'effectuate the legislative intent in light of the language used and the objects sought to be achieved' ") (quoting *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294 (1980)); *Watt v. Mayor and Council of Borough of Franklin,* 21 *N.J.* 274, 277, 121 *A.*2d 499 (1956) (declaring that "it is the function of the court to ascertain the intention of the legislature from the plain meaning of the statute and to apply it to the facts as it finds them"). We therefore concur with Justices Stein and Zazzali concerning the application of the Forfeiture Act.

## II.

The disqualification provision of the Faulkner Act provides:

> Any person convicted of a *crime or offense involving moral turpitude* shall be ineligible to assume any municipal office, position or employment in a municipality governed pursuant to this act, and upon conviction thereof while in office shall forfeit his office; provided, however any person convicted of such an offense who has achieved a degree of rehabilitation which in the opinion of the appointing authority and the Civil Service Commission, as to employment subject to the Civil Service law, indicates his employment would not be incompatible with the welfare of society and the aims and objectives of the governmental agency, may be considered eligible to apply for employment or be continued in employment. Any person who shall violate any of the provisions of sections 17–14, 17–15, or 17–16 of this article shall upon conviction thereof in a court of competent jurisdiction forfeit his office.
>
> [*N.J.S.A.* 40:69A–166 (emphasis added) (footnotes omitted).]

The Faulkner Act, which was enacted in 1950, applies to only 127 of the State's 566 municipalities. Given the inapplicability of the Forfeiture Act's prohibition on future office holding, McCann could be a candidate in the other 439 municipalities, assuming he satisfied other requirements. The State is thus called upon to explain the reasons and justification for the differing treatment between municipalities.

Under our Constitution, because a heightened bar to eligibility for office holding impacts indirectly on the right to vote, the proffered justification must be supported by something more than "mere rationality." *Matthews v. City of Atlantic City, supra*, 84 *N.J.* at 168, 417 *A.*2d 1011. Rather, a "requirement or restriction for candidates for elective office must be reasonably and suitably tailored to further legitimate governmental objectives." *Id.* at 169, 417 *A.*2d 1011; *see also Gangemi v. Rosengard, supra*, 44 *N.J.* at 175, 207 *A.*2d 665 (striking as unconstitutional under the equal protection clause, Faulkner Act requirement that elected officers in cities of the first class be registered voters for at least two years, whereas elected officers in other Faulkner Act municipalities were not subject to such a durational requirement). That is the equal protection test we employ under our State Constitution. *Greenberg v. Kimmelman*, 99 *N.J.* 552, 567, 494 *A.*2d 294 (1985) (stating that "[i]n striking the balance, we have considered the

nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction"); *State in the Interest of L.M.*, 229 *N.J.Super.* 88, 97, 550 *A.*2d 1252 (App.Div.1988) (stating that "focus is on whether an appropriate governmental interest is suitably furthered by the disparate treatment embodied in the action complained of") (citing *Barone v. Department of Human Servs.*, 107 *N.J.* 355, 368, 526 *A.*2d 1055 (1987)), *certif. denied,* 114 *N.J.* 485, 555 *A.*2d 609 (1989).

Obviously, applying the proper standard is critical and the enhanced standard enunciated in *Matthews* could make a difference in a specific case. However, because the proffered justification for the Faulkner Act's standard for eligibility for office does not even meet the less stringent rational basis test employed under the United States Constitution, we will analyze the case from the perspective of both standards.

### III.

The focus of our inquiry thus is whether there is a rational basis to be advanced for precluding persons convicted of crimes of moral turpitude from holding office in Faulkner Act municipalities while permitting such persons to serve in other forms of government. The Faulkner Act essentially adopted the disqualification provision that had been prevalent in our law for many years. Indeed, at the time of Faulkner's adoption, the State Civil Service Law broadly authorized the Chief Examiner to disqualify for testing or to refuse to certify any person "guilty of a crime" or "infamous or notoriously disgraceful conduct" or "who has been dismissed from the public service for delinquency." *N.J.S.* 11:9–6 (*L.* 1930, *c.* 176, § 19). Likewise, specific disqualification provisions barred persons convicted of a crime of moral turpitude from becoming a member of a police or fire department. *N.J.S.* 40:47–3 (1945). (*L.* 1917, *c.* 152, Art. XVI, § 3). Thus, Faulkner was not an enactment that broke with the past and "began" to address a problem incrementally. It merely incorporated long-standing notions of who should be disqualified from public office.

On the contrary, it was the Forfeiture Act, enacted eighteen years after Faulkner, as part of a full scale revision of the criminal code, that first broke with the past. The Forfeiture Act provides:

A person holding any public office, position, or employment, elective or appointive, under the government of this State or any agency or political subdivision thereof, who is convicted of an offense shall forfeit such office or position if:

(1) He is convicted under the laws of this State of an offense involving dishonesty or of a crime of the third degree or above or under the laws of another state or of the United States of an offense or a crime which, if committed in this State, would be such an offense or crime;

(2) He is convicted of an offense involving or touching such office, position or employment; or

(3) The Constitution or a statute other than the code so provides.

[*N.J.S.A.* 2C:51–2.]

More importantly, subdivision 2(d) provides for perpetual disqualification from holding public office:

In addition to the punishment prescribed for the offense, and the forfeiture set forth in subsection a. of *N.J.S.A.* 2C:51–2, any person convicted of *an offense involving or touching on his public office,* position or employment shall be forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions.

[*N.J.S.A.* 2C:51–2d (emphasis added).]

The Forfeiture Act is a careful legislative judgment that modulated prior law by distinguishing what justifies forfeiture from what justifies disqualification. That it was intended to have broad effect is revealed by the fact that it is part and parcel of Title 2C and obviously is meant to govern all persons convicted of all criminal offenses. Indeed, upon its enactment, with the exception of the Faulkner Act, all other disqualification laws were repealed. What occurred here seems obvious to us. The Legislature simply overlooked Faulkner when it enacted the Forfeiture Act--no more and no less.

## IV.

In attempting to justify Faulkner's disqualification provision, the majority at bottom points to only one purported justification: the great power of mayors in Faulkner Act municipalities. Although it may well be that in some Faulkner Act municipalities,

the power of the mayor exceeds that in some other forms of government, the argument is wide of the mark. All "New Jersey municipalities enjoy the same basic powers and have the same basic responsibilities." 34 *New Jersey Practice, Local Government Law*, § 1.8, at 14 (Michael A. Pane) (rev. 3d ed. 1999). Although the various forms of government, within and without Faulkner Act municipalities, allocate legislative and executive power differently, the reservoir of power collectively remains the same.

Moreover, greater mayoral powers are not unique to Faulkner Act forms, that is, some Faulkner Act forms have a strong mayor and weak council. *N.J.S.A.* 40:69A–31 to –67 (mayor-council plan); *N.J.S.A.* 40:69A–115 to –132 (small municipality plan); *N.J.S.A.* 40:69A–149.1 to –149.16 (mayor-council-administrator plan). Some Faulkner Act forms have a strong council and weak mayor. *N.J.S.A.* 40:69A–81 to –98 (council-manager plan). Likewise, some non-Faulkner Act forms have a strong mayor and weak council. *N.J.S.A.* 40A:62–1 to –7 (towns); *N.J.S.A.* 40A:61–2 to –7 (cities); *N.J.S.A.* 40A:60–1 to –7 (boroughs). Some non-Faulkner Act forms have a strong council and a weak mayor. *N.J.S.A.* 40:79–1 to –6 (municipal manager); *N.J.S.A.* 40:70–1 to –3 (commission form of government); *N.J.S.A.* 40A:63–8 (villages); *N.J.S.A.* 40A:63–1 to –7 (townships). In short, no specific power feature distinguishes all Faulkner Act forms of government from all non-Faulkner Act forms.

Further, even if a specific Faulkner Act form of government is one of "strong" mayor, it correspondingly has a "weak" council, yet the eligibility requirements for office holding remain the same for both offices. What possible rationale can be advanced to justify the legislative judgment that heightened eligibility requirements are necessary for those seeking to occupy a "weak" council office in a Faulkner Act municipality but not those seeking to occupy a "strong" council position in other Faulkner and non-Faulkner forms of municipal government? The answer is none.

In our view there is no discernible legislative objective to be advanced by precluding persons convicted of crimes of moral

turpitude from holding office *only* in Faulkner Act municipalities. The differing treatment does not suitably, and in an appropriately tailored fashion, advance a rational legislative purpose, as it must for its impact, albeit indirect, affects the right to vote. *Matthews, supra.* Nor does it meet even the lesser rational basis standard. The Faulkner Act's heightened eligibility standard is unconstitutional as applied to plaintiff in our view.

## V.

For those reasons and for the reasons expressed by Judge D'Italia, we respectfully dissent.

*For affirmance as modified*—Justices STEIN, COLEMAN and ZAZZALI—3.

*For reversal*—Justices LONG and LaVECCHIA—2.