574 A.2d 983
JAMES E. MOORE, JR., APPELLANT, v. YOUTH CORRECTIONAL
INSTITUTE AT ANNANDALE AND THE NEW JERSEY
DEPARTMENT OF CORRECTIONS, RESPONDENTS.

Argued February 26, 1990—Decided June 12, 1990.

258

*Robert A. Fagella* argued the cause for appellant (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

*Jeffrey A. Bartolino,* Deputy Attorney General, argued the cause for respondents (*Robert J. Del Tufo,* Attorney General of

New Jersey, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns the interpretation of *N.J.S.A.* 2C:51-2(a)(2), which provides that a person holding public employment shall forfeit public employment if he or she "is convicted of an offense involving or touching such office, position or employment." Moore, a senior prison corrections officer, was convicted in municipal court of harassing his supervisor, a petty-disorderly-persons offense. His employer, the New Jersey Department of Corrections ("DOC"), determined that he had forfeited his employment as a result of his conviction. The Merit System Board of the Department of Personnel ("Merit Board") and a majority of the Appellate Division also affirmed Moore's removal from his employment. Moore appeals as of right by reason of a dissent in the Appellate Division. *R.* 2:2-1(a)(2).

I

In 1975 DOC employed James Moore as a corrections officer at the Youth Correctional Institute at Annandale ("YCIA"). Moore's present employment woes began on the evening of December 23, 1985, when correctional officers looked out their windows and observed an odd spectacle. A figure covered with a white sheet was waving its arms from the courtyard. Within a few seconds inmates came to look out the windows. The words "Ku Klux Klan" sounded among the inmates. About twenty to twenty-five inmates expressed their concern at the sight of the white-sheeted figure.

The sergeant in charge commenced an investigation of the incident by calling into his office the only other correctional officers on duty. He told them that if either of them had been involved in the incident he better "fess up now or there would be big trouble." Moore then admitted to having thrown a sheet

over himself. Moore left the room and returned with a sheet, which he gave to the sergeant. Moore denies admitting that he did anything with the sheet besides throwing it over his shoulder.

The day after the incident Moore was suspended without pay. Captain Michael J. Morris, Moore's immediate supervisor, took charge of the investigation of the incident. He drafted seven charges against Moore: neglect of duty, creating a disturbance, mental abuse of inmates, intentional misstatement of a material fact, intentional abuse or misuse of authority or position, notoriously disgraceful conduct and leaving an assigned work area without permission, thereby creating a danger to persons or property. At a departmental hearing, Captain Morris acted as the prosecutor. Following the departmental hearing, Moore was removed from his position.

Moore appealed his removal to the Merit Board, which referred the matter to the Office of Administrative Law. During the time the appeal was pending, the Department forbade Moore from entering the Annandale facility and granted him no pay or benefits. Moore obtained employment as a laborer with a local trucking company.

At the hearing conducted before an Administrative Law Judge (ALJ), Captain Morris assisted the Deputy Attorney General who prosecuted Moore. The ALJ found that Moore had thrown one or more sheets over his head and had walked through the courtyard in full view of the inmates. The ALJ concluded that the evidence supported a finding of guilt on all charges except notoriously disgraceful conduct and creating a danger to persons or property by leaving an assigned work area without permission.

Nonetheless, after considering Moore's work record and concluding that Moore's conduct was not malicious, criminal, inherently evil, or committed with intent to injure, the ALJ recommended that the appropriate sentence was suspension without pay for a period of thirty days not removal. The Merit Board

announced that it accepted and adopted the findings of the ALJ. Specifically it reversed the earlier decision to remove Moore and instead imposed a thirty-day suspension on Moore and ordered that he receive back pay for the period following his suspension to the date of his actual reinstatement.

The events that led to Mr. Moore's municipal court conviction for harassing his supervisor occurred on the morning of November 26, 1986, the day after the Merit Board orally issued its order of reinstatement. Captain Morris testified that on the morning of the 26th he received a call at home from a man he identified as Moore. "You like to play with people's lives, I'm gonna ... fuck with your life," the voice said. Later, Mr. Moore arrived at Captain Morris' home. He drove his truck onto Morris' lawn and parked it in front of the house. Thereafter, Moore drove his truck into Morris' driveway, raced his motor, spun his tires, and drove away. Moore returned in a short while and parked across the street from Morris' house. Captain Morris emerged from his house to tell Moore to stop harassing him and to warn him that he should leave because he had reported him to the police and he could get in trouble. Moore responded that "he would do what he'd have to do."

Captain Morris later went to the White Township police and signed a complaint charging Moore with two petty disorderly complaints of harassment. Specifically he charged that Moore had harassed him: (1) "by telephoning complainant using offensively coarse language, and threatening to do harm, contrary to 2C:33–4(a)," and (2) "by repeatedly committing acts with purpose to harm or seriously annoy complainant to wit: came to home and remained in automobile racing his engine, sped off at high rate of speed and returned contrary to the provisions of 2C:33–4(c)."

After Captain Morris had returned home, Moore drove slowly past his home, turned around at the end of Morris' property line, drove up, got out of his car, and just stood and watched. Captain Morris called the State police, but Moore left before the

police arrived at Morris' house. Morris then drove to work where he again spotted Moore sitting in his truck at the entrance to the Annandale prison, observing him.

After a hearing in White Township Municipal Court, in which Moore appeared *pro se*, he was found guilty of both charges of harassment. The court merged the second conviction into the first and assessed Moore a fine of $100.00, costs of $25.00, and a Violent Crimes Compensation Board penalty of $30.00. Moore did not appeal that conviction.

On February 4, 1987, the DOC reinstated Moore to the payroll of YCIA. Shortly thereafter, the Department served him with a Preliminary Notice of Disciplinary Action announcing that it would seek his removal for conduct unbecoming a State employee (*N.J.A.C.* 4:1–16.9(a)9(ii) [1] and for his municipal-court convictions under *N.J.S.A.* 2C:33–4(a) and 2C:33–4(c). After a departmental hearing Moore once again was removed from his position. The Department's final notice of disciplinary action stated: "The following charges were sustained: *N.J.S.A.* 2C:33–4A, *N.J.S.A.* 2C:33–4c, *N.J.A.C.* 4:1–16.9(a)11. Conduct unbecoming an employee in public service. The following disciplinary action has been taken against you: Removal." .

Again, Moore appealed to the Merit Board, which referred the matter to the OAL. At the OAL hearing, Captain Morris testified as to the acts of harassment as set forth in his complaint. Moore admitted driving far from his home to Captain Morris' neighborhood and to passing the Captain's house more than once. However, he denied harassing Captain Morris. He stated that he had sought only to purchase a Christmas tree at the farms adjoining Captain Morris' house. He stated that he had not defended vigorously against the criminal conviction because he was unaware that forfeiture of his public position would be an ensuing result. Despite Moore's protestations, the

---

[1]Effective October 5, 1987, this regulation was recodified as *N.J.A.C.* 4A:2-2.-3(a)6.

ALJ recommended that Moore's appeal be dismissed and that his criminal conviction should result in the forfeiture of his State employment as of the date of his January 14, 1987, conviction. The Merit Board affirmed the ALJ's decision and determined that Moore had forfeited his employment on the date he had been convicted of the charges in municipal court.

Moore appealed the Board decision to the Appellate Division, the majority of which affirmed the Board. 230 *N.J.Super.* 374, 553 *A.*2d 830. Before the Appellate Division Moore argued that (1) he could not forfeit his employment at a time when he was not employed by the Department, and (2) in the alternative, even if he was employed, his municipal court conviction did not "involve" or "touch" that employment.

Both the majority and dissent rejected Moore's first argument and concluded that he was an "employee" on the day the harassment occurred. Because Moore did not file a petition for certification, that issue is not before the Court.

The Appellate Division, however, divided on Moore's second argument. The majority of the court concluded that Mr. Moore's deliberate and menacing conduct towards his supervisor in retaliation for being disciplined threatened the future work of the Department, implicated public safety, and "involved and touched" his employment as a senior corrections officer. Consequently, a majority of the Appellate Division affirmed the Merit Board.

The dissent, on the other hand, favored a narrow application of the forfeiture statute and maintained that because Moore's misconduct did not occur during working hours or at the place of employment, it did not "involve or touch" his employment. The dissent also asserted that the Department lacked jurisdiction to decide the issue of forfeiture because that should be decided only by the sentencing court. The dissent, however, recognizing that the Merit Board could fire Moore for conduct unbecoming an employee, would remand the matter to the Board for consideration of that issue.

On this appeal, Moore continues to argue that his criminal offense did not touch or involve his public employment; that forfeiture is too harsh a penalty for a petty disorderly persons offense; and, in any event, he should have had notice at the time of his municipal court hearing that his conviction could have resulted in forfeiture of his present State position and indeed all future state employment.

## II

*N.J.S.A.* 2C:51-2, governing the forfeiture of public office, states in relevant part:

a. A person holding any public office, position, or employment, elective or appointive, under the government of this State or any agency or political subdivision thereof, who is convicted of an offense shall forfeit such office or position if:

(1) He is convicted under the laws of this State of an offense involving dishonesty or of a crime of the third degree or above or under the laws of another state or of the United States of an offense or a crime which, if committed in this State, would be such an offense or crime;

(2) He is convicted of an *offense involving or touching such office,* position or employment; or

(3) The Constitution or a statute other than the code so provides.

b. The forfeiture set forth in subsection a. shall take effect:

(1) Upon finding of guilt by the trier of fact or a plea of guilty, if the court so ordered, or

(2) Upon sentencing unless the court for good cause shown, orders a stay of such forfeiture. If the conviction be reversed, he shall be restored, if feasible, to his office, position or employment with all the rights, emoluments and salary thereof from the date of forfeiture.

c. In addition to the punishment prescribed for the offense, and the forfeiture set forth in 2C:51-2a., *any person convicted of an offense involving or touching on his public office, position or employment shall be forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions.*

d. Any forfeiture or disqualification under subsection a., b. or c. which is based upon *a conviction of a disorderly persons or petty disorderly persons offense may be waived by the court upon application of the county prosecutor or the Attorney General and for good cause shown.*

(Emphasis added.)

The statute directs that forfeiture shall take effect at the time a State employee pleads guilty or is found guilty of either

an offense covered by 2C:51–2a(1) or an offense involving or touching employment. In addition, 2C:51–2b(2) allows the court that sentences the state employee to stay forfeiture pending appeal. Similarly, 2C:51–2d allows waiver of forfeiture or disqualification based on a conviction of a disorderly-persons or petty disorderly-persons offense when a county prosecutor or Attorney General has good cause to request it from the court.

Specifically, with respect to petty disorderly-persons offenses the statute makes certain assumptions that are particularly relevant to this appeal. First, it assumes that the sentencing court will know that the perpetrator of a disorderly persons offense is a public employee. Second, it assumes that the sentencing court will know that the nature or context of the crime touches and involves the defendant's public employment. And third, it assumes that the sentencing judge will know that the convictions of the petty disorderly offense will result in forfeiture of the perpetrator's public position, office, or employment. Operating on these assumptions, the statute fails to address situations such as the one involved in this appeal, in which neither the employee nor the sentencing court realized that a relatively minor conviction on a petty or disorderly-persons offense could lead to forfeiture of all public employment.

It is easy to perceive how crimes of dishonesty, extortion, theft, extreme perversity, or cruelty would be so notorious as to make automatic forfeiture at the time of sentencing logical and fair. After all, it is reasonable that a mayor convicted of mail fraud, extortion, and racketeering should be relieved of public office and barred forever from State employment. *State v. Musto*, 188 *N.J.Super.* 106, 456 *A.*2d 114 (App.Div.1983), aff'g, 187 *N.J.Super.* 264, 454 *A.*2d 449 (Law Div.1982); *see also State v. Botti*, 189 *N.J.Super.* 127, 458 *A.*2d 1333 (Law Div. 1983) (mayor and commissioner convicted of mail fraud). Likewise, few would argue that a supervisor in a county health department could keep his or her job after being found guilty of sexually abusing a five-year old. *Dinkins v. Cape May County*, 6 *N.J.A.R.* 202 (1986).

Even crimes that are not grave enough to trigger forfeiture under *N.J.S.A.* 2C:51–2a(1) may have an obvious connection to employment that would alert the trial court and the perpetrator that forfeiture would follow from a conviction. In *State v. Pittman*, 201 *N.J.Super.* 21, 492 *A.*2d 680 (App.Div.1985), the court deemed that three correctional officers who had pled guilty to disorderly-persons offenses arising out of their beating of a prison inmate had committed a crime that clearly involved and touched their employment, warranting forfeiture. Similarly, in *Schonwald v. Department of Transportation*, 5 *N.J.A.R.* 473 (1983), an engineer who was convicted of the misdemeanors of misconduct in office and solicitation of a bribe had forfeited his position because those crimes obviously touched and involved his employment. Thus even crimes that fall short of felony status may have an apparent relationship to the individual's employment.

■ Yet, the legislative scheme does not explicitly address situations, such as that of Moore, in which a public employee is convicted of a petty disorderly-persons offense that is not so obviously related to employment, through either its inherent gravity or context, as to alert the sentencing court or the defendant that forfeiture will follow from the conviction. Such cases require an analysis of the nexus between the crime and the employment to determine if there is a sufficient relationship between the two to warrant the harsh penalty of forfeiture.

■ In those instances the connection between the conviction and the employment will have to be examined initially by the governmental department in which the employee works, then by the appropriate administrative agencies to which the employee may appeal the departmental decision, and finally by the Appellate Division. The municipal court may not possess the thorough knowledge of the defendant's job requirements necessary to determine whether forfeiture is appropriate. Moreover, since the department in which the employee works is not a party to the court action, it cannot bring information relevant to

the employee's work requirements and responsibilities to the court's attention. It is far more efficient to grant the employee's department and administrative agencies initial jurisdiction to make the careful consideration of whether the offense should lead to forfeiture. The employee will retain the right to appeal to the Appellate Division once he or she has exhausted the administrative process.

The Legislature has recognized that some disorderly or petty disorderly-persons offenses may not warrant forfeiture. In its statements to Assembly No. 4479, dated December 17, 1987, the Senate Judiciary Committee explained that it wished to amend *N.J.S.A.* 2C:51-2 to provide exceptions to forfeiture when the crime did not merit the punishment:

> This bill attempts to ameliorate the harshness of 2C:51-2 as it applies to persons convicted of disorderly or petty disorderly persons offenses. The bill provides that while forfeitures and disqualifications would still apply in all cases, the sentencing court, upon application of the municipal or county prosecutor or Attorney General and for good cause, would have the discretion to waive these disabilities in any case where the underlying offense was a disorderly or petty disorderly persons offense. Under the bill, any person convicted of a disorderly or petty disorderly persons offense within the one year proceeding this act may have an application made on their behalf to the sentencing court to waive any disqualification which may have resulted from their conviction.

Governor Thomas Kean vetoed the bill and returned it to the General Assembly with his comments. Specifically, Governor Kean objected to municipal prosecutors being given the power to seek exceptions to the statute:

> The legislation, in its original form was carefully drafted to ensure that the waiver provision would be utilized only in the extraordinary case where necessary to remedy an obvious inequity caused by the present requirement of mandatory forfeiture for even the most minor offense. Consequently, only the Attorney General and the 21 county prosecutors—the highest ranking law enforcement officers at the State and county levels, respectively—were given the authority to request these waivers.... The power to request a waiver of mandatory forfeiture must be carefully circumscribed if it is to be wielded in a uniform and equitable manner.

Gov. Kean, Letter to the General Assembly (January 11, 1988). Thus, the Governor wanted the waiver provision to be narrow,

both in its substance and in the extent of power it gives officials to request it.

Governor Kean offered an explanation and example of when waiver would be appropriate:

> [R]equiring mandatory forfeiture of and permanent disqualification from public office may, under some circumstances, be too harsh a sanction for a minor infraction of our laws. For instance, law enforcement officers are often placed in confrontational situations which may result in a complaint being filed against them for disorderly conduct, including offensive language, shoving, offensive touching, etc. While these disorderly persons offenses should be taken seriously and dealt with sternly, they are not so serious in every case as to warrant the loss of position or the permanent, lifetime disqualification from holding such office.

This discourse between the Legislature and Governor discloses that the severe penalty of forfeiture was to be the punishment with regard to petty disorderly-persons offenses that involve and touch employment. Only in limited cases was the county prosecutor or the Attorney General to petition the trial court for waiver. Employees who are convicted of a petty disorderly-persons offense, and recognize that their offense does touch and involve their employment, can still for good cause request the county prosecutor or the Attorney General to petition the sentencing court for waiver. If such waiver were granted, then the department and administrative agencies would abide by the waiver and not impose forfeiture or disqualification on the employee. Even in cases, however, where the employee does not obtain a formal waiver, the department should consider whether the punishment of forfeiture fits the crime in its general consideration of whether the offense touched and involved employment. Forfeiture in these ambiguous cases does not occur automatically as it does in cases concerning grave crimes that obviously disqualify the employee for further State service. Since an analysis of whether the offense touched and involved employment precedes the imposition of forfeiture in these cases, the department and agencies will be able to consider all mitigating circumstances.

## III

■ The inquiry into whether an offense involves and touches on employment to the extent of meriting forfeiture requires careful examination of the facts and the evaluation of various factors in the "involve and touch" analysis. First, there is a need to assess the gravity of the crime as revealed by its nature, its context, and the identity of the victim. Second, there is a need to assess the qualifications required of the employee's public employment.

■ At the outset we reject Moore's contention that if the offense does not take place during employment hours or on employment grounds, it does not involve or touch employment. New Jersey cases have generally adhered to the involve and touch analysis outlined above and have applied it regardless of whether the employee committed the offense on the job premises or during work hours. In *State v. Botti, supra,* 189 *N.J.Super.* at 127, 458 *A.*2d 1333, the commissioner and mayor of Union City was convicted in federal district court on one count of conspiracy, fifteen counts of mail fraud, and two counts of tax evasion. The defendant had committed the crimes while he was a salesman for a private company, not while he was in office. The court considered Botti's crimes to have revealed grave dishonesty. He had defrauded a public agency. The court interpreted Botti's choice of victim as revealing an indifference to government and disrespect for its ideals. The court then looked to Botti's position as an elected official, and determined that he could not be trusted to handle the affairs of government, specially the delicate assessments of who should gain through government contracts. *Id.* 201 *N.J.Super.* at 34, 492 *A.*2d 680. Botti's crimes involved dishonesty, which triggered forfeiture pursuant to 2C:51–2a(1), but the court's analysis is still useful for purposes of 2C:51–2a(2) insofar as it explored the nexus that must exist between a criminal offense and employment for forfeiture to occur.

Other cases have followed the principle that it is the substance of the crime, not whether it was committed during work hours or on work premises, that should determine whether the offense "involved and touched" employment. In *State v. Heitzman*, 209 *N.J.Super.* 617, 508 *A.*2d 1161 (App.Div.1986), a state environmental employee convicted of growing marijuana was deemed to be subject to the penalty of forfeiture of his position even though his drug related activities all occurred outside his job and he claimed that he did not know that pleading guilty would result in forfeiture. In *New Jersey Turnpike Employees v. New Jersey Turnpike Authority*, 200 *N.J.Super.* 48, 490 *A.*2d 338 (App.Div.1985), a toll collector forfeited his position when he pled guilty to stealing money he had reported missing even though his thievery did not necessarily take place on work premises or during work hours. In *Bevacqua v. Renna*, 213 *N.J.Super.* 554, 560, 517 *A.*2d 1215 (App.Div.1986), an electrical inspector licensed by the State forfeited his position when he pled guilty to disorderly persons offenses based on his failure to remit inspection fees to a municipality. *See also State v. Bielecki*, 196 *N.J.Super.* 332, 337, 482 *A.*2d 527 (App.Div.1984) (police chief who lied to a state grand jury about state furniture in his possession subjected himself to discretionary forfeiture pursuant to *N.J.S.A.* 2A:81–17.2a3, requiring admissions "relating to employment or touching the administration of his office or position"), *certif. den.* 99 *N.J.* 216, 491 *A.*2d 710 (1984).

It was not relevant in any of those cases where or when the employee committed the crime. What does appear relevant is that the offense rendered suspect the employee's future service to the State, both in the capacity of the employee's job at the time of the conviction and in every other potential capacity. Hence, we find that the nexus between the offense and employment is not limited by time and location. When the infraction casts such a shadow over the employee as to make his or her continued service appear incompatible with the traits of trustworthiness, honesty, and obedience to law and order, then forfeiture is appropriate.

The forfeiture statute, as applied in the foregoing cases, is not merely a collateral attempt to punish a criminal offender. It also reflects a belief that the circumstances surrounding a criminal conviction bear directly on an employee's competency and capacity to continue to do his or her job or to perform any other job for the state. That an employee must be expected to continue performance of his or her duties serves to distinguish the present situation from pension cases, in which an employee has already accrued benefits and has retired from active service. In *Uricoli v. Police & Fire Retirement System*, 91 *N.J.* 62, 73–76, 449 *A.*2d 1267 (1982), the court distinguished pension forfeiture cases from the legislature's intent in providing for forfeiture of state employment as a sanction for improper official conduct. Similarly, in *Massa v. Public Employees Retirement System*, 87 *N.J.* 252, 259, 432 *A.*2d 1339 (1981), the court reasoned that a crime involving moral turpitude may be relevant to the employee's continued employment, but pension benefits accrued over past years of otherwise creditable service should not be subject to forfeiture due to a criminal offense unrelated and unconnected to employment.

█ In assessing whether Moore should forfeit state employment, the DOC in this case considered the gravity of the crime, and the qualifications required of a State correctional officer. Moore had a full hearing before his Department and before an ALJ and had ample opportunity to explain his side of the story. The DOC, the ALJ and the Merit Board all agreed that Moore's offense touched and involved employment to an extent warranting forfeiture. We find their determination well-supported by the record.

Accordingly, we affirm the judgment of the Appellate Division.

WILENTZ, C.J., and CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN, JJ., join in this opinion.