801 A.2d 1178 (2002)
353 N.J. Super. 178
STATE of New Jersey, Plaintiff-Respondent,
v.
Ferdinando GISMONDI, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued April 23, 2002.
Decided July 11, 2002.
James H. Waller, Camden, argued the cause for appellant (Sufrin, Zucker, Steinberg, Waller & Wixted, attorneys; Mr. Waller, on the brief).
Christine A. Hoffman, Deputy Attorney General, argued the cause for respondent (David Samson, Attorney General, attorney; Ms. Hoffman, on the brief).
Before Judges SKILLMAN, CARCHMAN and WELLS.
The opinion of the court was delivered by WELLS, J.A.D.
Ferdinando Gismondi, defendant, appeals from a judgment of conviction of the petty disorderly persons offense of harassment, in violation of N.J.S.A. 2C:33-4, which "forever disqualified [him] from holding any public office." That order followed a motion filed by the State seeking forfeiture of Gismondi's position as a police *1179 officer under N.J.S.A. 2C:51-2. The sentencing judge granted the motion.
The facts emerged during a jury trial of Gismondi and a co-defendant Stephen Thayer, both police officers of East Greenwich Township, on a five count indictment charging the officers with fourth degree aggravated assault by pointing a firearm at others, second degree possession of a firearm for an unlawful purpose, fourth degree "bias" harassment, third degree terroristic threats, and fourth degree "bias" assault.
During the night of April 3 and early morning of April 4, 1998, five teenagers (aged seventeen through nineteen) were gathered outside the home of Vasti Sturdivant in West Deptford, a community adjacent to East Greenwich. Each was related to Sturdivant and to each other. They all were going to sleep at Sturdivant's house that night. Each of the boys was African-American, and the neighborhood was "predominantly black."
At trial, each of the five boys described the incident in substantially the same way. As they stood talking in Vasti's driveway, at about 1:20 a.m. on April 4, 1998, they heard tires screeching from miles away; the noise got louder as the vehicle got closer. Finally, a Ford pickup truck came into view and slammed on its brakes, went in reverse, turned to go around the block, and came back past the boys. It was "driving all crazy," very fast and "side to side." Though the boys did not see who the occupants were, Gismondi later testified that he was the driver and Thayer the front seat passenger.
Gismondi circled the block a second time, again driving very fast. Some of the boys began yelling and cursing at the truck; for example, William Holmes yelled, "what the hell are you doing?" The truck slowed but continued making a third circuit.
On its third pass, the truck stopped next to a playground abutting Vasti Sturdivant's property, and the passenger door opened, after which the boys heard gunshots, which some of them saw coming from the passenger side of the truck. Thinking someone was trying to kill them, the boys ran for cover. In the boys' view, the shots were being aimed at them, as opposed to in the air. The boys variously estimated that there were thirteen to sixteen shots fired, all in rapid succession. While dodging bullets, Jeff Holmes ran into a pole and injured himself; he was treated at a hospital and released.
Vasti Sturdivant and two neighbors generally corroborated the boys' account; they could see and hear from their windows much of what had happened. One neighbor, Fred Mills, saw the passenger (Thayer) exit the truck and say "those bitches." The boys ran into Vasti's house, she called the police.
About 1:20 a.m. on April 4, 1998, Sergeant Dobbins of the West Deptford police was dispatched to a residence to check on a report of "[g]unshots being fired in the area." He testified as to what he saw at the scene:
I found five teenagers in the parkthe area of the driveway on the side of the house. They were in the driveway, they were in a panic yelling and screaming. They were extremely upset and one of the teenagers came up to me and he stated that he was injured.
Eyewitnesses reported to the responding officers that the culprits, two white males, had fired their guns in the air as they drove by twice in a Ford pickup truck. On the ground near the scene the investigating officers found a paper with Thayer's name on it, apparently a paper he had written for a college course. Based on that clue, the officers ran a Division of *1180 Motor Vehicles check, indicating that Thayer was the owner of a Ford pickup with a particular tag number; the officers broadcast an alert for that truck.
The officers' walking search of the area revealed ten spent shell casings from a .40 caliber gun. The State's ballistics expert testified that the casings came from bullets fired by the service revolver issued to Thayer. Despite an extensive search, both that night and in the daylight, they were unable to find any of the bullets from the casings or any sign of damage from the bullets.
After the incident, at about 1:41 a.m., Officer Kienholz of the Mantua police department stopped a Thunderbird being driven about 79 miles per hour by Gismondi, whom he recognized. As Gismondi appeared to be "fine," Kienholz gave him a verbal warning and let him go.
Later that morning, Lieutenant Goess of the East Greenwich police department was dispatched to Thayer's home in West Deptford in order to relieve Thayer of his service revolver. Thayer's wife awakened him, and he appeared to Goess to be highly intoxicated. After a frantic search of the house, Thayer finally found the weapon in a linen closet and gave it to Goess. Another officer relieved Gismondi of his firearm when he came to work the next morning.
Thayer and Gismondi had encountered the police in two separate incidents shortly before the shooting episode. At about 12:34 a.m. a 911 call was placed from a pay phone at a Heritage dairy store in Woodbury, a town adjacent to West Deptford. The caller (later identified by Gismondi as Thayer) asked for help because of some "loud music," to which the 911 operator replied that the police were on the way. Thayer and Gismondi drove off, but the officer dispatched to the phone, Officer Cope, stopped Thayer's truck because its horn was blowing. Cope did not realize that the truck was occupied by those involved in the 911 call. Because he recognized Gismondi (who then was the passenger), and because Thayer flashed his police badge, Cope did not question the two but drove off to further investigate the 911 call.
The second incident occurred a short time later, at about 12:50 a.m., when Officer Magee of the National Park police department, saw a Ford pickup truck parked illegally, part on and part off the parking lot of a tavern. He conducted a license tag check, which revealed that the truck was registered to Thayer.
As Magee started walking toward the truck, Thayer and Gismondi approached him. Magee recognized Gismondi and was aware that he was a police officer, and Thayer identified himself as a police officer, as well. They told Magee they had parked the way they had in order to joke with the owner of the tavern, and they complied with Magee's directive that they move the truck. Both men were cooperative and did not appear to Magee to be intoxicated. Magee decided not to issue a summons partly as a courtesy to fellow officers and partly because of their explanation for their erratic parking. Later that night, Magee realized that Thayer's pickup was the one involved in the shooting incident.
Gismondi testified on his own behalf and gave the following version of the events: On the night in question he and Thayer were celebrating Gismondi's pending job change; they began drinking about 8:00 p.m. and, riding in Thayer's Ford pickup. They went from bar to bar throughout the night. Gismondi was drinking beers, while Thayer was drinking shots and beers; Thayer was drinking more than Gismondi.
About 12:30 a.m., Thayer drove the truck to a pay phone in Woodbury, where *1181 he made a "joking" 911 call. During the call Gismondi was laughing at Thayer's facial expressions and mannerisms; Thayer was "intoxicated."
After the truck was stopped by Officer Cope, Thayer drove to another bar in National Park, where they encountered Officer McGee. They drank some more before leaving; this time Gismondi took over the driving, and he headed for Thayer's house in West Deptford.
At one point Gismondi "inadvertently" drove past an intended turn, and he "jammed on the brakes" and "skidded." He skid again when braking to make another turn. At some point Thayer told Gismondi to stop because he had "hit something." Thayer got out and felt the truck, at which point "things started to hit the vehicle." Gismondi drove forward to get out the "line of fire," at which time he "heard gunshots and ... took off up the street," leaving Thayer. He turned around and went back to get Thayer who he saw had been shooting his weapon into the air. Thayer told him that "they" had been throwing rocks at the truck. Thayer did not say who "they" were; indeed, he did not know because he never saw anyone.
Gismondi denied threatening or harassing anyone, and he denied being racist. He did not know, but he assumed, that the neighbor-hood was predominantly African-American. The two went home without reporting the incident, deciding to report it the next day when they had sobered up. Gismondi's only other evidence was the testimony of several character witnesses.
Gismondi was acquitted by the jury of all offenses except a lesser included offense, petty disorderly harassment. At the time of sentencing the judge considered and ruled upon the State's motion to forfeit Gismondi's public office of policeman. In a comprehensive oral opinion, Judge Lisa who had presided over the trial, granted the motion. He reasoned:
The application before me is governed by a provision in our criminal Code, 2C:51-2. In Subsection (a) of that section, there is a provision that a person holding any public office, position, or employment, who is convicted of an offense shall forfeit such office or position if:
(1), he is convicted of a third degree or higher crime, which is not the case with Mr. Gismondi here; or (2), he is convicted of an offense involving or touching such office, position, or employment.
Subsection (d) of that section goes on to provide if forfeiture is ordered as part of the sentence, it shall be permanent forfeiture.
Subsection (e) provides that the County Prosecutor or the Attorney General may apply to the court for a waiver of the forfeiture provision where the offense is a disorderly or petty disorderly offense, such as the case with Mr. Gismondi.
However, the prosecutor in this case has not applied for a waiver; and, in fact, has taken the opposite approach and has affirmatively moved for enforcement of the forfeiture provision.
Subsection (b) provides that the court shall enter the order of forfeiture immediately upon a finding of guilty by the trier of fact, unless the court, for good cause shown, orders a stay of that forfeiture pending a hearing on the merits at the time of sentencing.
This provision in its entirety, not just the last one I mentioned, the last subsection, but this provision in its entirety most clearly and obviously applies in situations where the offense arises out of the conduct engaged in by the public employee while acting in the course of his or her public duties.

*1182 For example, an on-duty police officer assault [of] a civilian without justification, such as in the case that you just mentioned, Mr. Waller, State v. Lazarcheck, [Lazarchick] which is reported at 314 N.J. Superior Court Reports, Page 500, decided by the Appellate Division in 1998, and for which certification was denied by the Supreme Court at 157 N.J., Page 546[, 724 A.2d 804].
In the cases such as this, however, where the conduct which is the basis for the offense for which the conviction occurred was off-duty conduct, a more probing analysis is required.
In Moore v. Youth Correctional Institute, 119 N.J. 256, 574 A.2d 983, decided in 1990, our State Supreme Court said at Page 269[, 574 A.2d 983]:
The inquiry into whether an offense involves and touches on employment, to the extent of meriting forfeiture, requires careful examination of the facts and the evaluation of various factors in the involve-and-touch analysis.
First, there is a need to assess the gravity of the crime, as revealed by its nature, its context, and the identity of the victim.
Second, there is a need to assess the qualifications required of the employee's public employment.
With respect to the second prong, the qualifications required of the particular employee's public employment, this is a regular member of a municipal police department. There is no need, in my view, in a case such as this one, for a separate hearing for a determination, after hearing testimony and evidence, to determine what the nature of that public employment is. It is commonly known and commonly understood; police officers are sworn to uphold the law, to observe, to be vigilant for, and to apprehend offenders, to investigate alleged violations of the law, and like responsibilities and duties. They are permitted to carry firearms, to make arrests, and to issue lawful orders to citizens in the course of their duties.
This is not intended to be an exhaustive explication of the scope of a police officer's duty, but it is a sufficient recitation to make it clear, in my judgment, that there is no need for a separate hearing for a determination of the scope of a police officer's duties and the qualifications for someone to hold that office as a police officer.
Obviously, the qualifications required to hold such a position require a high level of honesty, integrity, sensitivity, and fairness in dealing with members of the public, knowledge of the law, and a pattern and exhibition of law-abiding conduct.
With respect to the first prong of that test enunciated in Moore, there is a need to consider not only the seriousness of the crime, but an evaluation of its nature, its context, and the identity of the victim; or, in this case, victims.
The Moore court at page 271 said the forfeiture statute as applied in a number of cases that they just reviewed is not merely a collateral attempt to punish a criminal offender; it also reflects a belief that the circumstances surrounding the criminal conviction bear directly on an employee's competency and capacity to continue to do his or her job, or to perform any other job for the state.
Thus, it is proper to consider the circumstances surrounding the conviction as part of the so-called involve-and-touch analysis.
Addressing these factors in this case, based upon the evidence that I heard in this trial, I find the following to be pertinent:

*1183 First, that harassment is a very low level petty disorderly persons offense. In the overall hierarchy of our criminal and disorderly offenses and the graduation of them in our criminal code, this is the lowest level offense.
I find, secondly, that the victim was actually five victims, which magnifies the seriousness of the offense, since it was perpetrated against more than one person.
Third, I find that the victims were youthful individuals, which makes the offense more egregious.
Fourth, I find that the conduct of the defendant was purposeful as opposed to reckless or some lower level of mental culpability.
Fifth, I find that the defendant, in the circumstances surrounding this offense, was engaged in a course of conduct over a period of several hours, placing this into context, which is something that I believe is appropriate to do under the guidelines set forth by the Supreme Court in Moore. And over this course of hours, the defendant was drinking significant amounts of alcohol, driving while drinking, displayed his badge showing his position to other officers during the course of stops, during the course of the evening, in order to avoid repercussions from those stops, for potentially unlawful behavior, driving improperly. He drove his co-defendant to the sceneexcuse mehe drove his co-defendant to the scene and also from the scene; thereby, fleeing the incident. He did not report the incident to any lawful authority; and, in fact, when confronted by his own superior officers, he denied it.
Although I find as the sixth point, although only harassment, which is a low level petty disorderly offense, the overall context of this incident involved the discharge of a firearm at least ten times by the co-defendant. That conduct, the co-defendant, that conduct by the co-defendant is not imputed to this defendant, as a result of the jury findings in this case. But its presence as part of a fact pattern of what transpired adds a layer of context to the overall significance of this incident.
The Moore court stated at page 270 that when the infraction casts such a shadow over the employee as to make his or her continued service appear incompatible with the traits of trustworthiness, honesty, and obedience to law and order, then forfeiture is appropriate.
It is my conclusion, when considering all of the factors that I have just discussed, that Mr. Gismondi's conduct in this case meets this criteria. Because of the nature, the circumstances of this offense, although committed while off duty, by the standards that I've cited, it does involve or touch upon his office as a police officer; and, therefore, the motion of the State to include forfeiture of office as part of the sentence is granted, and I will include that as part of the sentence.
Gismondi raises the following points on appeal:
POINT I
THE PROSECUTOR'S MOTION TO FORFEIT THE APPELLANT'S PUBLIC EMPLOYMENT WAS MOTIVATED BY THE IMPROPER POLITICAL CONSIDERATIONS WAS ARBITRARILY MADE.
POINT II
THE TRIAL JUDGE'S DECISION TO FORFEIT THE APPELLANT'S PUBLIC EMPLOYMENT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE OR ANALYZED UNDER THE CORRECT STANDARD AND MUST BE REVERSED.
POINT III *1184 THE APPELLANT WAS ENTITLED TO THE PROTECTIONS AFFORDED POLICE OFFICERS IN N.J.S.A. 40A:14-147 PURSUANT TO MOORE.
We affirm for substantially the reasons set forth in Judge Lisa's thoughtful and comprehensive bench opinion of November 17, 2000. The judge properly construed and applied the statute, N.J.S.A. 2C:51-2(d) and (e) and the case of Moore v. Youth Correctional Institute at Annandale, 119 N.J. 256, 574 A.2d 983 (1990). Moore bears striking similarities to the present case. There, James Moore, a state corrections officer, was the subject of disciplinary charges by his supervisor and was suspended without pay. Id. at 260, 574 A.2d 983. Following a hearing Moore was removed from his position. Ibid. The day following a successful appeal of his removal to the Merit System Board, Moore made a threatening phone call to the home of the supervisor and later drove his truck onto the supervisor's lawn and parked it in front of his house. Id. at 261, 574 A.2d 983. Later he spun his wheels on the driveway and parked the truck across from the supervisor's house. Ibid. The police were called and Moore was charged with petty disorderly harassment. Ibid. Nevertheless, Moore continued his pattern of harassing conduct directed at the supervisor. Id. at 260-61, 574 A.2d 983. Moore was convicted in municipal court. Id. at 262, 574 A.2d 983. Ultimately the matter returned to the Merit System Board which assigned an ALJ to hear the case. Ibid. Following another hearing, Moore was found to have forfeited his position as the result of the harassment convictions. Id. at 263, 574 A.2d 983. Moore appealed. Ibid.
When the matter reached the Supreme Court, in construing the "involving or touching on his public office" language of N.J.S.A. 2C:51-2, it analyzed the gravity of the offense rather than whether it took place on or off work hours, or on or off the work site. Id. at 269-70, 574 A.2d 983. Its inquiry focused on the nexus between the offense and the employment and whether the employee's conduct "rendered suspect" his future service to the state. Id. at 270, 574 A.2d 983. In sustaining Moore's forfeiture of office under N.J.S.A. 2C:51-2, the Court concluded:
When the infraction casts such a shadow over the employee as to make his or her continued service appear incompatible with the traits of trustworthiness, honesty, and obedience to law and order, then forfeiture is appropriate.
The forfeiture statute, as applied in the foregoing cases, is not merely a collateral attempt to punish a criminal offender. It also reflects a belief that the circumstances surrounding a criminal conviction bear directly on an employee's competency and capacity to continue to do his or her job or to perform any other job for the state.
[Id. at 270-71, 574 A.2d 983.]
Following the decision in the present case, the Supreme Court decided another forfeiture case, McCann v. Clerk of City of Jersey City, 167 N.J. 311, 771 A.2d 1123 (2001). That case involved the question whether it was lawful to bar Gerald McCann, a former Mayor of Jersey City, from running again for that office, where early in a second term he was convicted of and sentenced for various federal offenses which occurred while he was out of office between 1986 and 1990. Id. at 316, 771 A.2d 1123. McCann forfeited his mayoralty in 1992 under the terms of N.J.S.A. 2C:51-2a(1). Id. at 316-17, 771 A.2d 1123. Nine years later, invoking N.J.S.A. 2C:51-2d, the Clerk of the City refused to process *1185 McCann's February 2001 petition for election.[1]Id. at 317, 771 A.2d 1123.
The Court once again addressed the construction of the "involving or touching on" language of both N.J.S.A. 2C:51-2a(2) and N.J.S.A. 2C:51-2d. Id. at 319, 771 A.2d 1123. The Court first noted that the language must mean more than the "dishonesty" language of N.J.S.A. 2C:51-2a(1) lest the distinction in language ends in no meaningful difference in the standard for forfeiture under subsections a(1) and a(2). Id. at 321, 771 A.2d 1123. The Court then found added support for this distinction because the sole basis for permanent forfeiture under N.J.S.A. 2C:51-2d is the "involving or touching on" language. Ibid.
As a result, the Court sharpened the test of subsections a(2) and d for forfeiture. Id. at 322-23, 771 A.2d 1123. In so doing it distinguished Moore and found that McCann's forfeiture under N.J.S.A. 2C:51-2d could not be sustained. Ibid. The Court concluded:
The narrow question in Moore was whether conduct committed during non-business hours and off the premises of the correctional facility at which Moore was employed could be considered to involve or touch on his employment for purposes of forfeiture. In determining that it could, we noted that "[w]hen the infraction casts a shadow over the employee as to make his or her continued service appear incompatible with the traits of trustworthiness, honesty, and obedience to law and order, then forfeiture is appropriate." Read in exclusion, that statement could be understood to support the Appellate Division's construction of subsection (d). However, the language of Moore should be understood in the context of the facts critical to our disposition, and it was undisputed that the petitioner's harassment of his co-employee in Moore bore a direct and substantial relationship to their respective governmental positions.

[Ibid. (citations omitted).]
In view of McCann and the trial judge's reliance on Moore, we have considered whether Gismondi's conduct meets the more stringent standard announced in McCann of a "direct and substantial relationship" to Gismondi's governmental position. We conclude it does. If Gismondi's behavior, which could be generically described as drunk and disorderly, had a more attenuated relationship to his public employment, this would be a much more difficult case under McCann. However, in an adjacent community in which Gismondi might well be called on to serve, he drove a truck on a wide-roaming drunken spree with a fellow officer in which an African-American neighborhood was terrorized, a trumped-up 911 call was made, a police service revolver was discharged, police badges were flashed to ward off attempts to investigate their conduct and no report was made to his superiors. Such conduct not only demonstrates bad judgment, but also Gismondi's participation in an abuse of authority resulting in the disruption of the public peace and exposure to the risk of harm of the lives and property of the citizens Gismondi was sworn to protect.
In short, we think it clear that even as a less culpable participant in the events of the evening in question, Gismondi's off-duty conduct involved or touched upon the public office of a policeman. The circumstances forming the basis of his offense of petty disorderly harassment bore a direct and substantial relationship to Gismondi's public position as a policeman and warranted *1186 his permanent disqualification from public office.
We have also considered whether an even more recent decision of the Supreme Court in Flagg v. Essex County Prosecutor, 171 N.J. 561, 796 A.2d 182 (2002) bears upon the issues in this case. There the issue was whether the county prosecutor had properly exercised his discretion in declining to waive forfeiture under N.J.S.A. 2C:51-2. Flagg was a twenty-nine year employee of the City of Newark Sanitation Department. He was driving a dump truck and as instructed by a supervisor picked-up a load of construction debris on a Newark Street and deposited it on another street about two blocks away. Flagg was charged with and convicted of various environmental offenses under Title 13E. Eventually, Flagg filed an action to compel the prosecutor to waive forfeiture of office under the statute or to state reasons for not doing so. In the Law Division the prosecutor offered reasons which the Court determined were insufficient and exempted Flagg from forfeiture. The State appealed.
We found that the standard governing the exercise of prosecutorial discretion was a patent and gross abuse of discretion. Under that standard, we concluded that the prosecutor's decision to seek forfeiture was not so wide of the mark as to require intervention. We, therefore, reversed. Flagg v. Essex County Prosecutor, 336 N.J.Super. 506, 512, 765 A.2d 278 (App. Div.2001). On certification to the Supreme Court, it held that the standard was simple abuse of discretion. It, therefore, concluded that on the facts the prosecutor had abused his discretion and thus reinstated the trial judge's ruling barring the prosecutor from seeking Flagg's ouster from his employment.
We hold that it was clearly not an abuse of discretion on the part of the prosecutor to seek forfeiture given the totality of the factual circumstances here. As we have indicated, Gismondi's conduct on the evening in question was utterly inconsistent with any reasonable expectation of the qualities of judgment and conduct expected for public employment as a police officer.
Affirmed.
NOTES
[1] There were other grounds as well for barring McCann's candidacy which do not bear upon the present case.