**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2212-17T3

JOSEPH DIBUONAVENTURA,

    Plaintiff-Appellant,

v.

WASHINGTON TOWNSHIP,

    Defendant-Respondent.

_____

Submitted January 28, 2019 – Decided March 25, 2019

Before Judges Messano and Rose.

On appeal from Superior Court of New Jersey, Law Division, Gloucester County, Docket No. L-0171-16.

Jacobs & Barbone, PA, attorneys for appellant (Louis M. Barbone, on the brief).

Brown & Connery, LLP, attorneys for respondent (Christine P. O'Hearn and Lauren B. Peltzman, on the brief).

PER CURIAM

In this police disciplinary action, plaintiff Joseph DiBuonaventura sought reinstatement to his position as a police officer with defendant Washington Township, back pay, and counsel fees following an administrative determination of misconduct. Plaintiff appeals from a December 7, 2017 Law Division order, denying his application for reinstatement, dismissing his complaint, and affirming the administrative decision.[1] We affirm.

We begin with a review of the relevant controlling authority. Because the Township is a non-civil service jurisdiction, the statutory framework for disciplinary proceedings against police officers is governed by N.J.S.A. 40A:14-147 to -151. Ruroede, 214 N.J. at 343. That statutory scheme requires the Township to demonstrate "just cause" for any suspension, termination, fine, or reduction in rank. Id. at 354 (citing N.J.S.A. 40A:14-147). Pursuant to N.J.S.A. 40A:14-147, just cause includes "misconduct."

Our Supreme Court has recognized "misconduct" under N.J.S.A. 40A:14-147 "need not be predicated on the violation of any particular department rule

_____

[1] The trial court's references in its order and written decision to "affirm[ing]" the hearing officer's decision are mistaken. Following a de novo review of the record before the hearing officer, "[t]he Law Division's actions were limited to affirming, reversing, or modifying the disciplinary conviction pursuant to N.J.S.A. 40A:14-150." Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 344 (2013) (emphasis added). Because the trial court conducted a de novo review here, its mistaken references are inconsequential.

2

or regulation," but may be based merely upon the "implicit standard of good behavior which devolves upon one who stands in the public eye as the upholder of that which is morally and legally correct." In re Phillips, 117 N.J. 567, 576 (1990) (citation omitted). Because "honesty, integrity, and truthfulness [are] essential traits for a law enforcement officer[,]" the Court has upheld termination where, for example, an officer made conflicting statements to internal affairs investigators about an off-duty altercation. Ruroede, 214 N.J. at 362-63; see also State v. Gismondi, 353 N.J. Super. 178, 185 (App. Div. 2002) ("[T]he qualifications required to hold [a law enforcement] position require a high level of honesty, integrity, sensitivity, and fairness in dealing with members of the public . . . .").

Pursuant to N.J.S.A. 40A:14-150, an officer is entitled to a hearing, and if convicted of any charge, he may seek review in the Superior Court. Ruroede, 214 N.J. at 355. As noted, the trial court's review is de novo. Ibid. The trial court must provide "an independent, neutral, and unbiased" review of the disciplinary action, and make its own findings of fact. Id. at 357 (citing Phillips, 117 N.J. at 578, 580 (1990)). The court must "make reasonable conclusions based on a thorough review of the record." Ibid. (quoting Phillips, 117 N.J. at 580). "Although a court conducting a de novo review must give due deference

3

to the conclusions drawn by the original tribunal regarding credibility, those initial findings are not controlling." Ibid. (quoting Phillips, 117 N.J. at 579).

Our role in reviewing the de novo proceeding is "limited." Phillips, 117 N.J. at 579. We "must ensure there is 'a residuum of legal and competent evidence in the record to support'" the court's decision. Ruroede, 214 N.J. at 359 (citation omitted). We do not make new factual findings, but merely "decide whether there was adequate evidence before the . . . [c]ourt to justify its finding of guilt." Phillips, 117 N.J. at 579 (citation omitted). "[U]nless the appellate tribunal finds that the decision below was 'arbitrary, capricious[,] unreasonable[,]' or '[un]supported by substantial credible evidence in the record as a whole,' the de novo findings should not be disturbed." Ibid. (fourth alteration in original). On the other hand, we do not defer to the trial court's legal conclusions. Cosme v. Borough of E. Newark Twp. Comm., 304 N.J. Super. 191, 203 (1997) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Against that legal backdrop, we turn to the facts pertinent to this appeal. On April 17, 2015, the Washington Township Police Department (WTPD) issued administrative charges against plaintiff for, among other things

"[m]isconduct by a police officer," and recommended plaintiff's termination.[2] The charges stemmed from a motor vehicle stop on July 31, 2012 of Assemblyman Paul Moriarty, who had previously served as the Township's mayor. At the scene, plaintiff arrested and charged Moriarty with driving while intoxicated, N.J.S.A. 39:4-50, refusal to submit to a breath test, N.J.S.A. 39:4-50.4a, and failure to maintain a lane, N.J.S.A. 39:4-88(b). Later that night, Moriarty contacted various media outlets, alleging plaintiff and the WTPD engaged in misconduct during the incident. The next day, the WTPD initiated an internal affairs investigation.[3]

At issue is plaintiff's veracity in the completion of his investigation reports memorializing the stop, and his conduct in requesting other officers to

---

[2] The next month, the WTPD filed additional charges against plaintiff, including misconduct for issuing fictitious warnings during several motor vehicle stops (warnings charges). After a full hearing on the warnings charges, the hearing officer found plaintiff guilty of misconduct, but held the penalty in abeyance pending his determination of the April 17, 2015 charges. Plaintiff has not appealed the trial court's de novo determination of misconduct on the warnings charges.

[3] In May 2013, the Gloucester County Prosecutor dismissed all traffic summonses against Moriarty, and a Gloucester County Grand Jury indicted plaintiff with various offenses arising from Moriarty's arrest and the warnings charges, including four counts of second-degree official misconduct, N.J.S.A. 2C:30-2(a). Following a jury trial in February 2015, plaintiff was acquitted of all charges.

corroborate his account. In his initial report, plaintiff claimed he "was on patrol travel[]ing in the right northbound lane of State Highway 42 . . . when [he] was cut off by [Moriarty's] blue Nissan M[u]rano . . . ." Plaintiff further stated the vehicle "was changing lanes from the left northbound lane to the right northbound lane in an attempt to enter the Greentree Road jug handle when it cut [him] off." The initial report did not include plaintiff's telephone conversations with WTPD Investigator Lisa Frattali.

However, in his supplemental investigation report, dated August 13, 2012, plaintiff detailed two cellphone calls he received from Frattali just prior to his stop of Moriarty's vehicle:

> During th[e] first call, Investigator Frattali told me that Paul Moriarty was inside Turnersville Nissan [(dealership)] drunk. She said that Detective [Martin] Calvello . . . gave her this information while they were sitting in the [WTPD] Detective Bureau Office. Investigator Frattali then told me that she would call me back in a few minutes with additional information. [Three minutes later], I received a second call on my cell phone from Investigator Frattali. During this second call, Investigator Frattali told me that Paul Moriarty was leaving the . . . [d]ealership in a blue Murano and he was "smashed." She said that Detective Calvello was getting this information from his cousin Ernie[,] an employee at [the dealership]. At this point, I started making my way towards the . . . [d]ealership. Once on State Highway 42, I stopped on the grass median facing northbound traffic just north of the [dealership]. A few minutes later, I observed a blue

A-2212-17T3

Murano travel[]ing past in the northbound lanes. At this point, I made a U-turn and attempted to observe the Murano's operation. (See initial investigation report).

Frattali testified at the administrative hearing and confirmed she made two telephone calls to plaintiff on the incident date. She recalled "the first words out of [her] mouth were, Moriarty is drunk at [the dealership]." However, Frattali denied she told plaintiff she would call him back with more information during the first call, or that she stated Moriarty was "smashed" during the second phone call. Frattali also denied telling plaintiff during the second telephone call that Moriarty was driving a blue Nissan Murano, or indicating the source of the information was Calvello's cousin, Ernie.

According to Frattali, plaintiff contacted her on August 7, 2012, requesting that she complete a supplemental report stating she dispatched plaintiff to the dealership. Because she did not do so, Frattali refused to issue a supplemental report. However, at the request of her superior, Frattali filed a supplemental report on September 24, 2012 stating, among other things she overheard Calvello's telephone call, wherein he asked, "What do you mean Moriarty is drunk at [the dealership?]" Frattali's supplemental report also stated she "contacted [plaintiff] and while having a conversation with him [she] jokingly told him that [she] overheard . . . Calvello talking to someone on the

phone about Moriarty being drunk at [the dealership]." However, "[a]t no time did [Frattali] instruct [plaintiff] to go to [the dealership] to investigate anything."

Plaintiff's patrol vehicle was equipped with a mobile video recorder (MVR). When plaintiff issued his initial investigation report, he did not believe the incident was captured on the MVR. However, on August 6, 2012, before plaintiff issued his second report, WTPD Captain Robert Borkowski told plaintiff that the MVR's hard drive would have captured the incident. Borkowski asked plaintiff whether he wanted him to retrieve the recording of Moriarty's violation from the hard drive, but plaintiff did not respond to Borkowski's inquiry.

The events depicted on the video recording were vastly different from the account described in plaintiff's investigation reports. The discrepancies provided the bases for the administrative charges at issue here. For example, unlike plaintiff's accounts memorialized in both reports, the video depicts Moriarty's vehicle passing plaintiff's patrol car on State Highway 42. Plaintiff then followed Moriarty's vehicle, with at least one other car between them, for approximately five minutes. Contrary to plaintiff's initial report, which twice stated Moriarty's vehicle "cut off" plaintiff's vehicle, the video recording does not support that account.

The Township's administrative charges also specified plaintiff's "intentional[] false, misleading and inaccurate" statements set forth in his supplemental report. Among other things, Frattali told plaintiff Moriarty "was inside the [dealership] drunk"; and Moriarty "was leaving the [d]ealership in a blue Murano and he was 'smashed.'" Because plaintiff completed his supplemental report after he realized the WTPD obtained the hard drive of the MVR's footage, the Township charged plaintiff with "knowingly l[ying]" in his initial investigation report.

Further, the Township's charges included false statements made by plaintiff during his April 13, 2015 interview with WTPD's Internal Affairs Department (IAD), including Frattali's statement to plaintiff that Moriarty was "smashed"; and plaintiff's denial of any animosity toward Moriarty or any previous incidents with him. However, plaintiff later conceded he yelled at Moriarty and was "involved in the placement of a large inflatable rat depicting or symbolizing either Paul Moriarty or his then-office as [m]ayor," regarding a police-union issue.

Pursuant to N.J.S.A. 40A:14-150, plaintiff was afforded a full hearing, during which the hearing officer considered the testimony of four witnesses, including Frattali, and several documents, including the MVR footage. In

January 2016, the hearing officer issued a written decision, finding the Township sustained the misconduct charge.

Generally, the hearing officer found all of the witnesses who testified, except Frattali, were "very credible." Characterizing Frattali's testimony as "very interesting[,]" the hearing officer determined "portions of her testimony [were] truthful." However, the hearing officer did not find credible Frattali's statement denying she said Moriarty was "smashed" during her second telephone call with plaintiff. Accordingly, the hearing officer did not sustain misconduct concerning that statement, but did so on the bases that plaintiff made other false statements in his initial report and during his interview with the IAD.

Citing the controlling authority, the hearing officer ultimately concluded "the only appropriate penalty" was termination. Thereafter, plaintiff filed this action.

Following oral argument, the trial court conducted a de novo review of the record and issued a sixty-page, single-spaced written decision, finding the Township proved misconduct pursuant to N.J.S.A. 40A:14-147. This appeal followed.

On appeal, plaintiff primarily contends the trial court's finding of misconduct, based on his dishonesty in preparing his initial report, was both

unreasonable and unsupported by substantial credible evidence in the record. Plaintiff also argues the "[c]ourt's finding that plaintiff harbored animosity against Moriarty [was] simply unreasonable." Finally, plaintiff claims the matter should be remanded to the trial court to impose a "suitable suspension" based solely on the court's determination of misconduct on the warnings charges.

We reject these contentions in light of the record and applicable legal principles. Pursuant to our "limited" standard of review, Phillips, 117 N.J. at 579, we affirm substantially for the reasons expressed in the trial court's comprehensive written decision, recognizing it "is based on findings of fact which are adequately supported by the evidence" in the record. R. 2:11-3(e)(1)(A). In doing so, we determine the court's decision was not arbitrary, capricious, or unreasonable. Phillips, 117 N.J. at 579. We add only the following remarks.

In reaching its decision, the trial court meticulously parsed the evidence, including the MVR footage, finding plaintiff's initial investigation report contained false statements and omissions. The court was "extremely persua[ded]" by the timing of plaintiff's supplemental report. Specifically, plaintiff did not issue his supplemental report, nor request Frattali and Calvello to issue their own supplemental reports, until he learned from his conversation

A-2212-17T3

with Borkowski that the incident was captured on the MVR's hard drive. Plaintiff's claim that the court ignored "more substantial and credible testimony" in the record is unavailing.

In particular, plaintiff overstates the significance of the "truthfulness" of his supplemental report. While the court noted the supplemental report "more closely aligns" with the events captured on the MVR, the misconduct charges before the court stemmed from the false statements and omissions memorialized in plaintiff's initial report. Indeed, the trial court noted plaintiff's false statements regarding Frattali's telephone calls, set forth in his supplemental report, were not "before it for determination since plaintiff ha[d] appealed only the charges against him which were found meritorious by the hearing officer and the Township ha[d] not appealed any changes found not proven." Accordingly, it is immaterial that plaintiff eventually "told the whole story and truthfully recounted" the incident in his supplemental report.

Nor do we find any merit to plaintiff's argument that the court failed to consider he filed his initial report, believing Frattali and Calvello would submit supplemental reports. On the contrary, the court specifically noted that, although Frattali and Calvello may have had the responsibility to report "Moriarty's circumstances at [the dealership]," plaintiff was not thereby relieved

A-2212-17T3

of his duty to "set forth in his report a true and accurate recitation of why it [wa]s that Moriarty and his blue Nissan Murano came to [plaintiff's] attention in the first place[.]" Instead, plaintiff's initial report "leave[s] the very clear impression that the 'cut off' by [Moriarty's vehicle] and nothing more was the sole basis for the stop." Thus, whether plaintiff believed in good faith that the other detectives would file their own reports, his duties included filing a full and accurate police report.

We also reject plaintiff's claim that the court improperly credited Frattali's testimony regarding the timing of plaintiff's request for her supplemental report. In particular, plaintiff claims the court's finding is at odds with "the hearing officer's conclusion that Frattali was not credible." Plaintiff's argument is belied by the record. For example, the hearing officer specifically found truthful Frattali's testimony that plaintiff asked her "to file a supplemental report saying she directed [him] to go to the . . . dealership." The trial court likewise determined Frattali's testimony "that on August 7, 2012, she received plaintiff's request to prepare a supplementary re[port] regarding her conversations with him on July 31, 2012" was "believable." As the trial court aptly recognized, the significance of that request was, in part, the timing, specifically, "it [was made] one day after plaintiff's conversation with Borkowski."

13

Nonetheless, the court's finding of dishonesty was based on various factors, apart from the timing of plaintiff's supplemental report. Specifically, in its thorough comparison of the MVR footage with plaintiff's investigation reports, the court made several findings underscoring plaintiff's false statements and omissions. Among other things, plaintiff's description of Moriarty's vehicle, changing lanes from the left to the right lane, is contradicted by the MVR footage, which depicts Moriarty's vehicle traveling in the right lane without changing lanes. The court thus found plaintiff falsely stated "Moriarty cross[ed] over three lanes to get to the jughandle" in an attempt "to lend credence and believability to his claim that Moriarty cut him off." Notably, the court found plaintiff's failure to notify dispatch or his supervisors of his pursuit of a reported drunk driver further "suggest[ed] that he [was] hiding something."

We therefore conclude there is more than a "residuum of legal and competent evidence in the record to support" the trial court's decision. Ruroede, 214 N.J. at 359. Accordingly, plaintiff's conflicting statements and omissions were sufficient evidence of misconduct by a police officer. Id. at 362-63.

Plaintiff's remaining contentions lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14                                                A-2212-17T3